**an angle used by HCSO to financially injure the Plaintiff due to his having had one of their own, Colonel James Previtera, asked to find employment elsewhere (technically terminated from HCSO) by FDLE.**   Thus, the formation of the secondary corrupt enterprise against the Plaintiff was first orchestrated by David Gee at the HCSO and Manuel Menendez at the 13th Judicial Circuit, a violation under **(Title 18, Chapter 96, Section 1962(b & d))**. It was first implemented by Claudia Isom and James Previtera on 3-1-12, case 12-CP-249, a violation under **(Title 18, Chapter 96, U.S. Code 1962(d))**. And when the second RICO predicate act was committed against the **Plaintiff** during case 14-CA-10278 by Bernard Silver on 2-6-15, their actions were in violation of **(Title 18, Chapter 96, U.S. Code 1962(c))**. Robert Foster aided and abetted the primary enterprise in implementing an extrinsic fraud on the Plaintiff as a member of the secondary enterprise when he illegally signed a final order permanently dismissing court case 12-CP-1669 with **prejudice**, on 05-15-13.   See Appendix A documents.


**Both James Previtera and Claudia Isom Wanted to Injure the Plaintiff Financially Anyway They Could out of Revenge:**

**1)** Claudia Isom was most likely transferred out of the circuit civil court division prior to 2012 due to the many complaints made about her to the authorities, two of which were made by the

126

Plaintiff to the 13th Judicial Circuit and the Judicial Qualification Commission (JQC) headed by the chief judge of the Florida Supreme Court during the Plaintiff's personal injury lawsuit, around 2002, case 01-CA-5911. And **2)** James Previtera wanted revenge on the Plaintiff for FDLE having strongly recommending to David Gee that he be removed from both his position and employment at HCSO due to the Plaintiff having rightfully complained about this diabolical government employee. **Claudia Isom and James Previtera initially formed the pattern and purpose behind the RICO predicate acts committed in this matter.** The pattern requirement under RICO, is how **related and continuous** the predicate acts are. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 233 (1989). The court noted that **"[r]etaliatory acts** are inherently connected to the underlying wrongdoing exposed by the **whistleblower** [; therefore,] **in most cases, retaliatory acts and the underlying scheme" will satisfy the relatedness requirement.** *DeGuelle v. Camilli*, 664 F. 3d 192 (7th Cir. 2011), Id. at 201. **Manuel Menendez (respondeat superior to Claudia Isom)** and **David Gee (respondeat superior to James Previtera)** can be sued under **Title 18, Chapter 96, Section 1962(b),** when they orchestrated the RICO plan around 2/2012 that was later implemented again on the Plaintiff starting around 8/2012 by the chief judges office within the 13th Judicial Circuit, instructing judges in this

district to injure the Plaintiff in his business and/or property during his court cases. The accomplices are: **Claudia Isom; Manuel Menendez under Sections § 1962(b) and the Respondeat Superior Doctrine; James Previtera; David Gee under Section § 1962(b) and the Respondeat Superior Doctrine,** for the above cited reasons.

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 17:**

The Court held that the mail fraud statute protects traditional property rights, "but does not refer to the intangible right of the citizenry to good government." *McNally v. United States,* 483 U.S. 350 (1987), Id. at 356. **In 1988, Congress voided the** *McNally v. United States* **"intangible rights" limitation by amending the mail fraud statute, Title 18, Chapter 63, Section 1341, to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."**

*Skilling v. United States,* 561 U.S. 358 (2010), was a United States Supreme Court case interpreting the honest services fraud statute, 18 U.S.C. § 1346. The court held, in the case involving former Enron CEO Jeffrey Skilling, that the honest services fraud statute, which prohibits **"a scheme or artifice to deprive another of the intangible right of honest services",**

**covers only bribes and kickback schemes (direct or <u>indirect</u>), where a public official was 1) paid <u>in some way</u> (not necessarily money) for a particular <u>decision or action</u>, <u>or 2) failed to disclose a conflict of interest, resulting in personal gain (something of value, but not necessarily money)</u>.**

According to the American Bar Association, Volume 18, Number 3 January/February 2009, by *Razzano and Kristin H. Jones*, Since the enactment of 18 U.S.C. § 1346, federal courts have tried to step into this gap. They have divided the universe of honest services fraud into two spheres: public and private honest services fraud. Public honest services fraud is the instrument used by federal prosecutors to impose the federal government's view of good government on state and local officials. **Since the national government under our federal system cannot pass bribery or conflict of interest laws covering local and state officials, the honest services fraud statute has become its vehicle for enforcing its view of good government on state and local jurisdictions.** The theory is that when a local or state official <u>**1) takes a bribe, or 2) is embroiled in a conflict of interest, he or she defrauds the people of the state or locality of their right to that public official's honest services**</u>. The courts have widely recognized two theories of honest services fraud in public-sector honest services fraud prosecutions: **(1) bribery, where a public official was <u>paid</u>, with some type of**

**valued benefit** (not necessarily money), for a particular decision or action, **or (2) a failure to disclose a conflict of interest resulting in personal gain (something of value, but not necessarily money).**

The 11th Circuit's position is that "[p]ublic officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest. '**If the official instead secretly makes his decision based on his own personal interests. . . the official has defrauded the public of his honest services**.'" *United States v. DeVegter*, 198 F. 3d 1324, 1328 (11th Cir. 1999) (quoting *United States v. Lopez-Lukis*, 102 F. 3d 1164, 1169 (11th Cir. 1997) (emphasis added) (internal citation omitted).

The First, Fourth, Ninth, and Eleventh Circuit Courts have all held that **the federal statute does not limit the meaning of "honest services" to violations of state law.**

**Ninth Circuit Joins Other Circuits in Ruling that Honest Services Fraud Conviction of a Public Official Does Not Require a Violation of State Law:**

As the Ninth Circuit decided in *United States v. Weyhrauch* in 2008:  Because laws governing official conduct differ from state to state, conditioning mail fraud convictions on state law means that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would

not.   **Congress has given <u>no indication</u> it intended the criminality of official conduct under <u>federal law to depend on geography</u>.**   *United States v. Weyhrauch*, 548 F. 3d 1237 (9th Cir. 2008).

Courts are divided over how much knowledge a defendant must have of the criminal enterprise to be a conspirator under § 1962(d). The District of Columbia Circuit and the Second Circuit have held that **the plaintiff must allege that the defendant knew about and agreed to facilitate the <u>scheme</u>.**   *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F. 3d 1043, 1052 (D.C. Cir. 2012) (upholding dismissal of RICO conspiracy claim because "RSM failed to allege facts sufficient to support a plausible inference that *Freshfields* knew of and agreed to further the bribery-racketeering conspiracy") and *Baisch v. Gallina*, 346 F. 3d 366, 377 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)).   Similarly, the Seventh Circuit has stated that the defendant must **"knowingly agree to facilitate the activities of those who operate or manage a criminal enterprise."**   *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F. 3d 862, 869-70 (7th Cir. 2001).   See also *Brouwer v. Raffensperger, Hughes & Co.*, 199F. 3d 961 (7th Cir. 2000) and *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F. 3d 862, 869-70 (7th Cir. 2001).   According to the Fourth and Fifth Circuits, **the plaintiff must prove only that the "defendant participated**

in the conspiracy with knowledge of the <u>essential nature</u> of the **plan."** *United States. v. Tillett*, 763 F. 2d 628, 632 (4th Cir. 1985) and *United States v. Elliott*, 571 F. 2d 880, 903-04 (5th Cir. 1978).   **It is "not necessary to prove that the defendant knew all of the <u>details</u> of the unlawful enterprise <u>or the number or identities of all the co-conspirators</u>."** *Dale v. Frankel*, 131 F. Supp. 2d 852, 860 (S.D. Miss. 2001) (quoting *United States v. Posada-Rios*, 158 F. 3d 832, 858 (5th Cir. 1998)).

The accomplices cited in Section 17 denied both the Plaintiffs and the decedent their state and federal substantive due process rights under the 5th and 14th amendment to the U.S. Constitution. **At this point, the RICO predicate acts committed by Claudia Isom and James Previtera did not keep the Plaintiff from acquiring any money owed to him (no business or property damages), but the alliance formed at this time did so on 2-6-15 in case 14-CA-10278.   <u>James Previtera and Claudia Isom initially help start all of the racketeering activities committed by the state judicial enterprise on the Plaintiffs and decedent in this matter</u>!**   The agreement HCSO had with the 13th Judicial Circuit, approved, orchestrated and overseen by both Manuel Menendez at the 13th Judicial Circuit and David Gee at HCSO, was the beginning of Florida judges violating both the Plaintiff's and decedent's state and federal substantive due process rights under Title 18, Chapter 96, Section 1962(c) since 2/2012 because

of the following: **The court emphasized that "one who opts into or participates in a conspiracy is liable for the acts of his [or her] co-conspirators which violate [S]ection 1962(c), even if the defendant did not personally agree to do, or to conspire with respect to, any particular element."** *Smith v. Berg*, 247 F. 3d 532, 534 (3d Cir. 2001), Id at 537. See also *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 257 F. App'x 49 (9th Cir. 2007).

The agreement between James Previtera, Claudia Isom, Manuel Menendez and David Gee was a racketeering violation on 3-1-12, during case 12-CP-249, under Title 18, Chapter 96, U.S. Code 1962(d), as the initial RICO plan and first RICO predicate act committed to monetarily injuring the Plaintiff in the future. **And on 2-6-15, during case 14-CA-10278,** under Title 18, Chapter 96, U.S. Code 1962(c), as participants under 1) (Title 18, Chapter 96, Codes § 1961-1968), 2) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 3) (Title 18, U.S. Code § 3), 4) (Title 42, Chapter 21, Section 1983), 5) Title 18, Chapter 13, U.S. Codes § 241 & 242, 6) Title 18, Chapter 95, Section 1956 and 7) Fraud on the Court, **an injury to the Plaintiff's property interest was first committed by the secondary enterprise.**

**Claudia Isom's RICO predicate act during case 12-CP-249 became the first RICO predicate act committed in this matter, and when Bernard Silver joined up with the secondary enterprise on 2-6-15**

(within four (4) years from 3-1-12 with the first injury committed) and violated the Plaintiff's state and federal substantive due process rights, by illegally dismissing case 14-CA-10278, he helped in covering up both the aggravated manslaughter (Florida statute 782.07) of the decedent and legally aided and abetted the defrauding of the Plaintiff by the primary enterprise on 5-15-13.

Thus, the second RICO predicate act was committed in this matter by the secondary enterprise, forming both the pattern and purpose of racketeering activities committed on the Plaintiff and decedent since 3-1-12, case 12-CP-249, in Hillsborough County, Florida, home of the proud and the brave, but not the free. In *United States v. Price*, 383 U.S. 787 (1966) and *United States v. ReBrook*, 837 F. Supp. 162, 171 (S.D.W.Va. 1993), rev. in part, 58 F. 3d 961 (4th Cir. 1995), cert. den. 516 U.S. 970 (1995), the Court reasoned as follows:  Concrete parameters outlining the duty of honest service should **not be necessary** in order for a person to be charged with violating this duty.  **The concept of the duty of honest service sufficiently conveys warning of the proscribed conduct when measured in terms of common understanding and practice.  The Constitution requires no more.**

**Section 18.    Craig Villanti, Daniel Sleet and Anthony Black**
(secondary enterprise) can be sued under **(Title 18, Chapter 96,
Codes § 1961-1968), (Title 18, Chapter 13, U.S. Codes § 241 &
242), (Fraud on the Court)** and **(Title 18, U.S. Code § 3)**, for
participating under **(Title 18, Chapter 96, Section 1962(c))** when
they failed to reverse Chet Thorpe's false order made on 11-27-
18, case 18-CA-1537, that was appealed with the 2DCA, case 2D18-
4761, as a Writ of Quo Warranto and affirmed by these same
accomplices on 01-24-19 in the ever continuing RICO plan
implemented now by Chad Chronister at HCSO and Ronald Ficarrotta
at the 13th Judicial Circuit to defraud and injure the Plaintiff
in his business or property interests under **(Title 18, Chapter
63, U.S. Codes § 1341, 1343 & 1346)**.  This bogus ruling by the
state judicial enterprise was yet another RICO predicate act
used for the purpose of **A)** further monetarily injuring the
Plaintiff, but in **his business interest to the amount of
$15,000**, by defrauding the Plaintiff out of his state and
federal constitutional rights as racketeers in violation of the
Civil RICO Act when they were legally required by law to act
appropriately.

Once Manuel Menendez gave the word for Claudia Isom to defraud
the Plaintiff during his guardianship case (12-CP-249) back in
2/2012, with the approval of upper management within the state
judicial enterprise, Edward LaRose's obedient 2DCA judges in

turn accommodated the request made by their superior under Title
18, Chapter 96, 1962(c) as willing members of the secondary
enterprise.  The accomplices are: **Charles Canady, Rick Scott,
Pamela Bondi (upper level management under Section § 1962(b))
within the secondary enterprise), Edward LaRose (Section §
1962(b)), Craig Villanti, Daniel Sleet, Anthony Black, Chet
Thorpe, Ronald Ficarrotta (Section § 1962(b)) and Michael D'Lugo.
And the Defendants are:  Chart Industries, Inc. for vicarious
liability under the Respondeat Superior Doctrine in conjunction
with Section § 1962(b & c) violations and ABC, Inc. for
vicarious liability under the Respondeat Superior Doctrine in
conjunction with Section § 1962(a, b & c) violations,** damaging
the Plaintiff's business interests in Florida court cases as of
6-21-18.


**Further Analysis of the Ultimate Facts and Laws Supporting the
Counts of Section 18:**
For either a § 1962(d) conspiracy or § 1962(c) activity claim,
**the defendant need not agree to operate or manage the
enterprise.**  Salinas v. United States, 522 U.S. 52, 63 (1997)
(holding that **"[a] conspiracy may exist even if a conspirator
does <u>not</u> agree to commit or facilitate <u>each and every part</u> of
the substantive offense."**).  Rather, the defendant may be liable
**if it knowingly agrees to facilitate others who operate or**

**manage the enterprise.** For example, in *Brouwer v. Raffensperger, Hughes & Co.*, the Seventh Circuit reconciled a perceived conflict between the Supreme Court's opinions in *Salinas* and *Reves* by holding that to be actionable, the agreement need not be to manage the enterprise, but to **"facilitate the activities of those who do."** *Brouwer v. Raffensperger, Hughes & Co.*, 199 F. 3d 961 (7th Cir. 2000). See also *MCM Partners, Inc.*, 62 F. 3d 967; *United States v. Quintanilla*, 2 F.3d 1469, 1485 (7th Cir. 1993); *United States v. Starrett*, 55 F. 3d 1525, 1547-48 (11th Cir. 1995); *Tonnemacher v. Sasak*, 859 F. Supp. 1273, 1277-78 (D. Ariz. 1994); *Fid. Fed. Sav. & Loan Ass'n*, 830 F. Supp. at 261 and *Jones v. Meridian Towers Apartments, Inc.*, 816 F. Supp. 762, 772-73 (D.D.C. 1993). The Seventh Circuit reconciled a perceived conflict between the Supreme Court's opinions in *Salinas and Reves* by holding that to be actionable, the agreement need not be to manage the enterprise, but to **"facilitate the activities of those who do."** *Brouwer*, 199 F. 3d at 967. The Third Circuit has similarly held that a **"defendant may be held liable for conspiracy to violate § 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."** *Smith v. Berg*, 247 F. 3d 532, 538 (3d Cir. 2001).

**Section 19.**  All of the Defendants and co-conspirators (owners, employees, insured agents, agents and other accomplices) either directly implemented, and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, the racketeering activities committed in violation of the Plaintiffs' and decedent's 5th and 14th U.S. constitutional amendment rights by their having participated in violation of the RICO Act, under Title 18, Chapter 96, Section 1962(a and/or b and/or c and d), for either profit or gain (something of value).  Something of value by definition is **1)** anything that is pecuniary (monetary) or compensatory (used to offset) in value to a person, or **2)** the primary significance of which is economic gain (income generated). USLegal.com. **Since a favor given for a favor owed, is a compensatory service, there need not be any monetary payment or exchange under the Civil RICO Act for services rendered.**  And just satisfaction for a dirty job well done for the good of the enterprise is payment enough!  **No proof of economic motive is required under the Civil RICO Act.  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255-58 (1994).**  RICO does not require proof that the RICO predicate acts committed due to racketeering in Section § 1962(c) were motivated by an economic purpose.  **The "enterprise" in subsection (c) of Title 18, chapter 96, Section 1962, connotes generally the vehicle through which the unlawful pattern of**

138

racketeering activity is committed.  Since this vehicle is not being acquired (as an asset would be), it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity.  Nor is an economic motive requirement supported by the congressional statement of findings that prefaces RICO and refers to activities that drain billions of dollars from America's economy.  See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U. S. 479, 499. pp. 256-262.

All of the Defendants and their co-conspirators (owners, companies, agencies, employees, insured agents, agents and other accomplices) have been a part of the systematic and continuous state and federal substantive due process right violations over the last seven (7) years or more, orchestrated and committed by the four (4) corrupt enterprises (primary, secondary, third and fourth) cited, in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, all of which are still continuing in nature, and continuing against the Plaintiffs and the decedent.  As **grounds** therefore, Plaintiffs allege as follows:


20.  **Jurisdiction and Venue:**

First, Section 1965(b) of RICO provides that process **may be served** "in any judicial district of the United States" when required by the "ends of justice." **Being that the Plaintiffs would <u>not</u>, by beyond reasonable doubt evidence, receive a fair and equitable ruling in any <u>Florida</u> U.S. district court due to local political influences, as seen in the Plaintiff's federal case 8-17-CV-219-7-36MAP on 5-9-17, and being that ABC, Inc. (Disney) has offices, agents and affiliates in every major city in America, Title 18, Chapter 96, Section 1965(d) is applicable in that it allows process to be served "in any judicial district in which such person resides, is found, <u>has an agent, or transacts his affairs</u>."**

**Title 18 U.S. Code § 1965. Venue and process, U.S. Code Notes:**

**(a)** Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States in which such person resides, is found, **has an agent, or transacts his affairs.**

**WMTW, virtual and VHF digital channel 8, is an ABC-affiliated television station licensed to Poland Spring, Maine, United States and serving the Portland, Maine television market, including southern Maine and eastern and northern New Hampshire. The station is owned by the Hearst Television subsidiary of Hearst Communications, as part of a duopoly with Portland-licensed CW/MyNetworkTV affiliate WPXT (channel 51). The two**

stations share studios on Ledgeview Drive in Westbrook; WMTW's transmitter is located in West Baldwin, Maine.

WMTW also operates a low-powered digital fill-in translator (on UHF channel 26 or virtual channel 8 via PSIP) from the Time and Temperature Building in downtown Portland's Monument Square. The translator serves the immediate part of Portland and some surrounding areas to serve viewers that have difficulty receiving the main signal.

ABC, Inc. provides advertising from its customers, through its affiliated broadcasting stations, on signals transmitted from towers to end users in particular forums.

If a RICO plaintiff can show that at least **one defendant** "resides, is found, **has an agent, or transacts his affairs" in the forum**, then jurisdiction is proper as to **all other defendants** if "the ends of justice require." *Rolls-Royce*, 576 F. Supp. 2d at 779; *Paolino v. Argyll Equities, L.L.C.*, 401 F. Supp. 2d 712, 718 (W.D. Tex. 2005). Due process in such cases is satisfied if the nonresident defendant has sufficient minimum contacts with the United States. See *Busch*, 11 F. 3d at 1258; *Rolls-Royce*, 576 F. Supp. 2d at 782. Accordingly, courts have approved nationwide service of process under both § 1965(b) and § 1965(d). *ESAB Group, Inc. v. Centricut, Inc.*, 126 F. 3d 617, 626-27 (4th Cir. 1997), **holding that court had jurisdiction**

because defendant was served under nationwide service of process provision in Section 1965(d). And *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F. 3d 935, 942 (11th Cir. 1997), Section 1965(d) **"provides for . . . nationwide service of process."** And *PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F. 3d 65, 70-72 (2d Cir. 1998, finding that **Section 1965(b) provides for nationwide service of process.** And *Stauffacher v. Bennett*, 969 F. 2d 455, 460 (7th Cir. 1992), finding **nationwide service of process in Section 1965(b))**, superseded by *Central States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F. 3d 934 (7th Cir. 2000).

21.  The Plaintiffs claim a financial loss that is ascertainable and definable, **1)** Mr. Schneider's **property interest** loss amounts to **$1,060,000** ($700,000 cash, $225,000 home, $100,000 in coins and $35,000 in car & home furnishings) after being defrauded in case 12-CP-1669 and **2)** his **business interest** loss amounts to **$15,000** after being defrauded in case 18-CA-1537.  Ms. Kimball's property interest loss amounts to **$240,324** after being defrauded in case 17-CA-6219.  And Mr. Schneider's **property interest** loss amounts to **$6720** after being defrauded in case 17-CA-6219.

22.  The Plaintiffs claims standing to sue under Title 18, chapter 95, Section 1962(a), (b), (c) and (d).  **1)** The

plaintiffs are persons **2)** who sustained injuries **3)** to their **business and/or property interests 4)** by reason of the Defendants' violations under § 1962.  The Court confirmed that a **"RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."** Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 493-99 (1985), Id. at 496.

**23.**    The Plaintiffs currently claim federal jurisdiction pursuant to the Civil RICO Act, Title 18, Chapter 96, Codes § 1961-1968; Title 42, Chapter 21, Subchapter 1, U.S. Code § 1985(3) & 1983; Civil RICO Act Title 18, Part 1, Chapter 95, Sections 1954, 1956(a) & 1959; Title 18, U.S. Codes § 2 & 3; Title 18, Chapter 1, U.S. Code § 4; Title 18, Chapter 41, Section 880; Title 18, Chapter 73, Section 1512; Title 42, Chapter 21, U.S. Code § 1988; Title 18, Chapter 216, Section 3333; Title 18, Chapter 42, Sections 891-894; Title 18, Chapter 13, U.S. Codes § 241 & 242; common law tort of tortious interference with diversity of citizenship and damages over $75,000; Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346; Title 18, U.S. Codes § 201(b)(3) & 201(b)(4); Fraud on the Court and Title 42, Chapter 21, Section 1983, **all of which extends the jurisdiction to all federal courts.**

24.   The Plaintiffs bring this suit for violations of certain protections guaranteed to them and the murdered decedent under the First (1), Fifth (5) and Fourteenth (14) Amendments to the Federal Constitution under color of law.

25.   The Plaintiffs, Darryl Schneider and Sandra Kimball, are natural born citizens of the U.S. residing at 10406 N. 26th Street, Tampa, Hillsborough County, Florida  33612.

26.   The Defendants who were working for any number of enterprises involved in this matter during their employment, aiding and abetting other racketeering members who were defrauding and depriving the Plaintiffs and decedent of their state and federal civil rights for either profit or gain (something of value), when they directly implemented and/or assisted (even turning a blind eye to) under Title 18, U.S. Code § 3, for the purpose of both **A)** covering up the prior racketeering activities committed by the three (3) local enterprises and **B)** monetarily damaging the Plaintiffs' business and/or property interests by soliciting the court to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section 1956, when they were legally required by law to act appropriately.   All of the government Defendants and their accomplices are still continuing to act as accessories after the

fact by using their positions to do so either in the 13th Judicial Circuit, HCSO, 2DCA, Florida Governor's Office, Florida Attorney General's Office, Florida Supreme Court, Florida Department of State and Legislative Affairs, State Attorney's Office, Trump Administration, FBI, DOJ and Hillsborough County Coroner's Office, all co-conspirators in this matter under the Civil RICO Act, when they denied the Plaintiffs and decedent their state and federal substantive due process rights to respectively money owed and the decedent's murderers brought to justice.

27. This is a civil action for violations of Title 18, Chapter 96, U.S. Codes § 1961-1968 ("Racketeer Influenced and Corrupt Organizations Act" or "RICO") and other federal statutes cited. RICO addresses the corrupt abuse and misuse – **usually covertly** – of **organizations, entities, businesses, institutions** or even **governments or government agencies**, such that **superficially, legitimate entities actually operate for illegal purposes irrelevant to the entity's purpose**.

28. This Court has subject matter jurisdiction over this action pursuant to Title 28, Chapter 85, Codes § 1330, 1331 and 1332 and Title 28, Chapter 97, Section 1603. Jurisdiction is also proper pursuant to Title 18, Chapter 96, U.S. Code § 1965, which

allows for **nationwide jurisdiction** pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, Chapter 96, U.S. Codes § 1961-1968 and racketeering activities under Title 18, Chapter 95.

29.  This Court has subject matter jurisdiction over this action pursuant to Title 28, Chapter 85, U.S. Code § 1343 - **Civil rights** and elective franchise, specifically Title 42, U.S. Code § 1985(1) - Conspiracy to interfere with civil rights of subordinate trial judges by Manuel Menendez and Ronald Ficarrotta having made their judges injure the Plaintiffs and decedent fully and completely in the 13th Judicial Circuit, or be transferred to criminal court (Mark Wolfe and Elizabeth Rice were transferred to criminal court compliments of Ronald Ficarrotta).

30.  Jurisdiction is also proper under ***Davis v. Passman***, 442 U.S. 228 (1979), in so far as the **actions violated the Fifth (5) Amendment to the U.S. Constitution in violation of the equal protection component of this Amendment's due process clause.**

31.  This Court has supplemental jurisdiction over this action pursuant to Title 28, Chapter 85, U.S. Code § 1367.

32.    And this Court also has jurisdiction over this action pursuant to Title 28, U.S.C. § 1361, to order Clarence Thomas to perform the mandatory duty (writ of mandamus) of notifying the proper authority (DOJ) of a murder having been committed. **Under federal law, it is a felony for an officer, or employee, of the U.S. government, to fail to report (cover-up) the knowledge of a federal crime.**

33.    A complaint must be sustained, if relief could be granted under any set of facts that could be proved consistent with the allegations.   Federal Rule of Civil Procedure, Rule 8.   *Hishon v. King & Spalding*, 467 U.S. 69 (1984) citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

34. **Civil RICO Statute of Limitations:**

In a U.S. Supreme Court decision regarding the statute of limitations in civil RICO actions, the Court held in *Rotella v. Wood* 528 US 549, (2000), that the four-year statute of limitations period begins as soon as the plaintiff discovers his injury, **regardless** of when the fraud causing that injury is discovered. **This was an all-around wrong ruling since there was no second RICO predicate act committed in this case to call it a RICO case. Did the U.S. Supreme Court use the *Rotella* case to**

wrongly limit the pattern requirement in RICO cases, or did they wrongly make a RICO ruling on a common law fraud case?  Both! Looking at the following facts of the *Rotella* case:

1) There were no RICO predicate acts committed under Title 18, Chapter 96, Section 1961(1).  Improper relationships and illegal agreements without more details, are not Section § 1961(1) violations, just common law fraud torts.  And there was no indication that Mr. Rotella was made to stay at a medical facility longer than he should have.  Was Mr. Rotella in a locked facility, or could he have just walked out?

2) If there was racketeering on Mr. Rotella, he was not within the terms of Section § 1961(5) which is a 10 year limit for having filed his claim between the first and second RICO predicate acts committed.

3) Mr. Rotella did not have any stated property or business injuries.

So *Rotella* was technically a fraud case, not a RICO case.  The U.S. Supreme Court took the applicable facts of a common law fraud case and falsely used them to illegally limit the use of the RICO Pattern Discovery Rule in 2000.  <u>Fraud</u>!  The crooked U.S. government, through the U.S. Supreme Court, used the *Rotella* case to illegally undermine the mandatory Pattern Discovery Rule requirement when this case did not have a pattern of RICO predicate acts to have been a RICO case.  <u>Fraud</u>!  The

U.S. government was obviously trying to undermine the RICO rules and disenfranchise U.S. citizens of their legal right to sue under the Civil RICO Act. The *Rotella* case was no different than a fraud case.

There is a RICO <u>Pattern</u> Discovery Rule requirement in place in Section § 1961(5), so you can prove that a racketeering tort, not a common law fraud tort, was committed. Under the RICO Act, the two (2) RICO predicate acts committed must "amount to or <u>pose a threat of continued criminal activity</u>." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 238-39 (1989). Also, if another victim besides you was defrauded by the same enterprise using their same RICO pattern for the same purpose and you knew it, how would you apply the Continuing Violation Rule (CVR) to your lawsuit when there was no second RICO predicate act committed on you within the four (4) year limitation period? CVR violation has to be committed on the same victim.


Now let us look at this court case and its applicable facts that fit right in with the RICO Act rules:

<u>You can sue an opposing party in a court case under the RICO Act, if at least one (1) opposing party illegally benefited by having filed a clearly false pleading that was ruled favorably on, or if they subsequently acquiescing in after illegally</u>

benefiting from one (1) RICO injury committed on you during the case, 2) with the injuring enterprise consisting of at least one (1) judge, 3) that committing two (2) RICO predicate acts on you, thus forming the pattern requirement under the RICO Act, 4) when you were denied honest services.

So how do you tell if a judicial referee in a court case was acting as either 1) a member of a state judicial enterprise that was in on the plan to defraud you, 2) just erred or 3) personally and individually defrauded you one time for spite, not as a member of an enterprise? By taking additional legal recourse in:  1) Filing for a rehearing and submitting correspondence to the judge, telling him or her that, if he or she commits a second (2) RICO predicate act on you by affirming their obviously false prior ruling, you will sue him or her and their co-conspiring benefactors for any injuries caused in state or federal court under the RICO Act and provide a copy to opposing parties.  2) Filing an appeal.  Or 3) filing a new complaint with new counts and claims for the same or different (any) property or business interest owed to see if one (1) more RICO predicate act is committed by the same or a different judge working for the same state judicial enterprise, resulting in a second (2) RICO predicate act committed on you, thus confirming a judicial conspiracy to defraud under the RICO Act.  After a second RICO predicate act resulting in an 1) illegal dismissal,

2) permanent illegal suspension of some part of the discovery process or 3) an order stopping you from adding counts and claims to your complaint to conform with the evidence (all honest services frauds) in a A) related or B) new case, injuring the same victim or victims in any property or business interest, the victim or victims should <u>know absolutely</u> that state judicial racketeering was in play, not an error, or a personal onetime spite ruling by a judge (a Section § 1983 violation) who caused an injury, and can sue any one of their co-conspirators from any of their court cases who unjustly benefited (vicarious liability or subsequently acquiescing in) in violation of the RICO Act. <u>It is not the two (2) RICO predicate acts committed by opposing parties that starts the RICO accrual process, but after the second (2) RICO predicate act judicially committed within the ten (10) year limit under Section § 1961(5) and not more than four (4) years after the first injury (RICO predicate act) was committed (*Rotella* case), that resulted in at least one (1) injury during one (1) court case, to a party's or parties' property or business interest, and the victim or victims are still within the statute of limitations for filing a RICO complaint without tolling.</u>

<u>A RICO injury in a court case is usually the result of either 1) an illegal dismissal without further legal recourse taken, or the 2) illegal suspension of some part of the discovery process</u>

<u>that stops you from moving the case forwards to trial with all of the evidence without further legal recourse taken.  Or 3) an illegal order that keeps you from adding counts and claims to conform with the evidence, illegally benefiting an opposing party or parties without further legal recourse taken</u>.

In numbers 1 and 2 above, opposing parties would have to file false pleadings for the judge to deny honest services in these types of judicial order rendered, but in number 3, no false pleading would need to be filed by opposing parties. Consequently, an opposing party would have a reasonable amount of time to subsequently acquiescing in (30 days) by allowing the judge's illegal order to stand that wrongly benefited them, or you could sue them too.

<u>Judges and their state judicial enterprises pose the real threat of continued RICO activity within the court system, not opposing parties.  WITHOUT JUDICIAL RACKETEERING IN COURT CASES, THERE WOULD BE VERY FEW RICO INJURIES COMMITTED DURING COURT CASES</u>!


In any event, <u>the Plaintiffs' RICO case has three (3) huge differences from the *Rotella* case</u> in that due to the Plaintiff's tenacity (due diligence) in fighting multiple cabals (enterprises) during multiple court cases.

1) <u>The RICO predicate acts committed, first starting on 3-1-12, during case 12-CP-249, that started all of the defrauding</u>

<u>tactics used in injuring the Plaintiffs and decedent in nine (9)</u> <u>different court cases, out of four (4) different money amounts</u> <u>owed, have been continuous nonstop</u>!   Case <u>12</u>-CP-1669 was a Florida Slayer Statute tort ($1,060,000); case <u>14</u>-CA-10278 was a tortious interference with inheritance tort ($1,060,000); cases <u>14</u>-CA-12557 and <u>16</u>-CA-4693 were malpractice torts ($1,060,000); case <u>17</u>-CA-902 was a slander tort ($1,060,000); case 8-<u>17</u>-CV-219-7-36MAP was a federal Title 42, Chapter 21, Section 1983 tort (reversal of order sought); case <u>17</u>-CC-403 was a misrepresentation tort ($15,000) <u>still on hold</u>; case <u>17</u>-CA-4051 was a fraud tort ($1,060,000) <u>with appellate case 2D19-1384 just</u> <u>affirmed on 12-27-19</u>; case <u>17</u>-CA-6219 is a theft and dignitary tort ($6720 owed to Mr. Schneider and $239,724 owed to Ms. Kimball) <u>still in litigation</u>.   There is a current tenth (10) court case, case 17-CA-8903, which is a personal injury tort case that the Plaintiff has not yet been injured in under the RICO Act, but opposing parties did committed wire fraud (Section § 1343) in this case by filing clearly false solicitation pleadings, a violation under Title 18, Chapter 96, Section 1962(d).

Consequently, there is <u>no</u> statute of limitations problem under the <u>Last Predicate Act Rule</u> or the <u>Continuing Violation Rule</u> in tolling the statute of limitations in this matter because each

RICO predicate act committed was within the four (4) year limitation period that resulted in a <u>new and independent injury</u>, or <u>new "discrete act"</u>, that followed the same RICO pattern of defrauding the Plaintiffs in their property or business interest. After a civil RICO claim has accrued (pattern of racketeering exists), there will frequently be additional, <u>independent injuries</u> that will result from the <u>same violation of</u> <u>§ 1962</u>. *Bankers Trust Co. v. Rhoades*, 859 F. 2d 1096 (2d Cir. 1988).

As the Supreme Court made clear in *Sedima*, **RICO injuries flow from <u>individual predicate acts</u>**, not from the pattern itself. 473 U.S. at 495-97, 105 S. Ct. at 3284-85.

<u>The difference in these two accrual methods cited above is: 1)</u> <u>The Last Predicate Act Rule does not require another individual</u> <u>and separate injury to the pattern of RICO predicate acts</u> <u>committed to toll the statute of limitations an additional four</u> <u>(4) years, just another predicate act, but the Continuing</u> <u>Violation Rule does require another individual and separate</u> <u>injury committed on the same victim within four (4) years from</u> <u>the prior injury. But according to the *Rotella* Case, it does</u> <u>not matter if another injury was committed on a different</u> <u>victim, thus starting the accrual process, but it does if you</u> <u>are enacting the Continuing Violation Rule. When each</u> <u>additional RICO predicate act is committed with an injury on the</u>

same victim, as is the case in this matter, the statute of limitations is tolled for another four (4) years under CVR. Thus, both the Continuing Violation Rule and the Last Predicate Act Rule are applicable to this case.

Continuing Violation Doctrine is the principle that a tort continuing or repeating over time is treated as a whole such that the statute of limitations begins to run not when the tortious conduct begins, but when it ends. And the injuries occurring within the limitation period were not simply a continuation of the same injury that was sustained by the victim or victims. Each new RICO predicate act (clear abuse of discretion) committed on the Plaintiffs' as honest services frauds resulted in repeated injuries (new) implemented until the cases were damaged enough to end them! Whether they were committed in conjunction with a 1) revised complaint ordered during the same case, 2) a deposition denied during the same complaint or 3) an order by a judge that denied the Plaintiffs' their state and federal substantive due process rights to keep or add claims and counts to their revised complaints to conform with the evidence during the same case, it newly injured them under the RICO Act.

In *Larson v. Ferrellgas Partners*, No. 15-2789 (8th Cir. 2016), The majority held that, in an antitrust conspiracy suit, a continuing violation tolls the statue of limitations <u>as long as there were unlawful acts (e.g., sales to the plaintiff) within the limitations period, even if the alleged conspiracy was hatched outside the four-year statute of limitations period</u>. The dissent, however, argued that to avoid dismissal plaintiffs are required to show a live, <u>ongoing conspiracy within the limitations period. This is the case in this matter where the sale of honest services to consumers (the Plaintiffs) by the local courthouses were repeatedly denied (antitrust)</u>.

in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), the majority held that, in an antitrust suit, each allegedly unlawful sale <u>restarts the running of the statute of limitations regardless of whether the plaintiff had earlier knowledge of the allegedly illegal conduct</u>. In doing so, the majority recognized several weaknesses in this argument—namely, that *Klehr* <u>was a RICO case</u> and that the relevant passage in that decision is dicta (did not apply). Nonetheless, it concluded that <u>deference was owed to Klehr's expression of the continuing violation doctrine, which it read as consistent with other Supreme Court antitrust decisions</u>.

The Continuing Violation Rule is Applicable to <u>All types of Tort Law Cases</u> throughout America:

Delaware State Coll. v. Ricks, 449 U.S. 250, 261 n. 15, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) ("Mere requests to reconsider ... cannot extend the limitations periods applicable to the civil rights laws."). <u>However</u>, it is apparent from the Supreme Court's discussions in *Morgan* and *Ledbetter* that an employee who renews his request for particular accommodations may bring suit based on a <u>new "discrete act"</u> of discrimination if the employer again denies his request.   In *Morgan*, the Court explicitly stated that "[t]he existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are <u>independently discriminatory</u> and charges addressing those acts are themselves timely filed (in RICO, 4 years)." 536 U.S. at 113, 122 S. Ct. 2061; see also *Ledbetter*, 127 S. Ct. at 2174 ("[A] freestanding violation may always be charged within its own charging period regardless of its connection to other violations.").  All of the injuries committed on the Plaintiffs and decedent during their court cases were freestanding (independent) violations, irregardless of their relationship to the same property interest, business interest or murder investigation because they were independent and separate from each other and <u>no res judicata or collateral estoppel rules were</u>

applicable to any of the Plaintiffs' cases, but because the cases had to do with the same RICO pattern by the same enterprises, on the same victims, the Continuing Violation Rule is applicable in this matter.

Continuing Violation Rule espied its origins in tort law, e.g., *Dziura v. United States*, 168 F. 3d 581, 583 (1st Cir. 1999). The doctrine permits a plaintiff to recover for wrongdoing transpiring outside of the limitations period, which is saved from the limitations bar because of its connection to more recent misconduct. See *O'Rourke v. City of Providence*, 235 F. 3d 713, 730 (1st Cir. 2001). The Continuing Violations Doctrine has grown so closely associated with employment discrimination claims that some courts have assumed that the doctrine originated in cases interpreting Title VII. *Velazquez v. Chardon*, 736 F. 2d 831, 833 (1st Cir. 1984). A serial violation occurred when the defendant committed a series of discriminatory acts directed against a single plaintiff. Provided that an anchoring act of discrimination occurred within the limitations period preceding the filing of an administrative charge, the plaintiff could recover for all related instances of discrimination, subject to certain additional requirements that varied from circuit to circuit. *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F. 2d 396,401 (1st Cir.

1990).   In continuing violation scenarios the discovery rule may create a longer limitation period than would the continuing violation doctrine, where the harm becomes discoverable long after the unlawful conduct has ceased, or in cases the separate accrual version of the doctrine is applicable long after the particular segment of the conduct which caused the harm took place. *Rodriguez v. Banco Cent.*, 917 F. 2d 664, 666 (1st Cir. 1990). Where recurring conduct of a uniform nature is at issue, both its factual and its legal link with the future harm follow from the presumed presence of such links in the past. *Wessmann v. Gittens*, 160 F. 3d 790, 818 (1st Cir. 1998).


**Last Predicate Act Rule is Also Applicable to this Case:**
[F]rom the date the plaintiff knew or **should have known** that the elements of the civil RICO cause of action existed (four (4) years) **unless**, as a part of the same pattern of racketeering activity, there is **further injury** to the plaintiff **or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity.** *Keystone Ins. Co. v. Houghton*, 863 F. 2d 1125, 1130 (1988). "last predicate act" rule, allows a plaintiff to recover damages accumulated since the first injury as long as the last RICO violation ("last

predicate act") happened **within four years** of the lawsuit. "[If], as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, . . . **the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity.  The last predicate act need not have resulted in injury to the plaintiff, but must be part of the same pattern**." *Keystone Ins. Co. v. Houghton*, 863 F. 2d 1125, 1130 (1988).  And,


**Since courthouses are commerce based government businesses that offer honest services to the public in need of fair and equitable legal relief, and all of the racketeering in this matter occurred during the Plaintiffs' court cases in the form of honest services frauds, the Continuing Violation Rule is applicable to the Plaintiffs' type of antitrust matter**. *Klehr v. A.O. Smith Corp.*, U.S. Supreme Court, 521 U.S. 179 (1997) and In re *Pre-Filled Propane Tank Antitrust Litigation*, 860 F. 3d 1059 (8th Cir. 2017).  Antitrust law provides that, in the case of a "continuing violation," say a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, **"each overt act that is part of the violation and that injures the plaintiff, starts the statutory period**

160

**running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times**." 2 *Areeda*, ¶ 338b, at 145 (footnote omitted); see also *Zenith*, supra, at 338; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502, n. 15 (1968); *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F. 3d 462, 467 (CA6 1996). **But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period -- outside of the 4 year limit period after the second (2) RICO predicate act was committed on you, without tolling the statute of limitations. And within 10 years between the first and second act. And,**

2) The Plaintiff is Not in Violation of the Injury Discovery Rule using equitable tolling methods, specifically due to concealment fraud, case 12-CP-1669 and in being misled, case 14-CA-10278:

Keep in mind that the ruling in the *Rotella* case only applies to the Injury Discovery Rule without using equitable tolling methods. Normally you have to litigate a RICO complaint within the guidelines of both Section § 1961(5), 10 years between the first and second act committed. And from the *Rotella* case, within 4 years after the second (2) act was committed, unless

you should have known there was racketeering committed on you after the first act.

You have to litigate a RICO complaint within four (4) years after either:  1) one (1) RICO predicate act was committed on you that you should have known was by an enterprise, 2) after a second RICO act was committed on you and within four (4) years after this second act, not exceeding 10 years between the first and second act, committed by the same enterprise, or after a 3) second RICO act was committed on someone else and within four (4) years after the second RICO act was committed on another victim by the same enterprise that you had knowledge of and within 10 years between your first and their second act, without tolling.

There were over forty (40) RICO predicate acts committed by Florida's state judicial enterprise to defraud the Plaintiffs in their property and/or business interests that were continuous. A "pattern of racketeering activity" requires at least two (2) acts of racketeering activity (RICO predicate acts), one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.  Section § 1961(5).

3) For this law, the statute of limitations is tolled in any U.S. circuit court indefinitely:  The statute of limitations on an heir suing a co-conspirator for an injury that they caused when they were an accessory (aided and abetted in) after the fact (AATF) in a murder, is tolled indefinitely.  In order for the Defendants, FLMIC, CNA and AI, <u>not</u> to have been required under their contracts with their clients to pay the Plaintiff his inheritance money owed under the Florida Slayer Statute 732.802, they have been <u>continuously</u> co-conspiring, from case 14-CA-10278 to case 2D19-1384, and will be co-conspiring forevermore to cover-up the decedent's murder.

In addition, . . . murder is a RICO predicate act, and it would certainly be anomalous if a cause of action based on death did not survive the death of the would-be plaintiff (decedent).  We cannot conclude that Congress ignored the brutal history of organized crime by providing a defense to criminals who have the foresight to kill their victims.  <u>We hold that civil RICO claims do not abate upon the death of the injured party</u>.").  We falsify legal history, when, as we often do, read modern distinctions back into legal history.  That said, in Roman law, which did not reflect from its earliest times, our modern distinctions, hardly an eternal verity, between "crime" and "tort," civil actions, brought ex delicto, for multiple damages (e.g., theft, robbery with violence, outrage, and wrongful damage to property) did not

survive against the offending party, <u>but they did for an heir of the offended party</u>.  G. INST. 4.112-13 (F. de Zulueta trans., 1946) (addressing survival); id. at 6.189-215 <u>(discussing the scope of delicts for multiple damages)</u>.  Volume 88 | Issue 4, Article 1, 4-1-2013, Time-Bars:  Rico-Criminal and Civil Federal and State, <u>G. Robert Blakey</u>, University of Notre Dame, <u>g.r.blakey.1@nd.edu</u>.  <u>As long as any co-conspirators continue to cover-up the decedent's murder during court cases, they will continue to owe the Plaintiff for injuries to his property inheritance interest including interest at a nominal rate</u>. <u>Actus reas</u> is a Latin term which means guilty act.  In order to be convicted of this crime, a crime must have taken place and you must have done something to help <u>(aid or abet) the person who committed the crime to escape arrest and/or punishment</u>.  The statute of limitations for committing, or aiding and/or abetting in, after the fact in a murder is tolled indefinitely.

For murder in aid of racketeering under 18 U.S.C. § 1959 **(2006) implicates the death penalty**, for which Title 18 provides that murder is **"without limitation."** Id. § 3281; see also *United States v. Payne*, 591 F. 3d 46, 57-59 (2d Cir. 2010) (following *Smith v. United States*, 360 U.S. 1, 8 (1959), which held that charging the **statute** rather than facts warranting **death invokes the unlimited period of limitations**). Volume 88 | Issue 4, Article 1, 4-1-2013, Time-Bars:  Rico-Criminal and

Civil Federal and State, G. Robert Blakey, University of Notre Dame, g.r.blakey.1@nd.edu. **As for being an accessory after the fact (AATF) in a murder, the penalties are less, but the statute of limitations is also unlimited.**

**Outside of a fraud on the court or a AATF in a murder**, courts that have permitted equitable tolling of the four-year limitations period in civil RICO cases after two (2) RICO predicate acts have been committed, based on one of three grounds: **1) fraudulent concealment, 2) continuing tort or conspiracy, or 3) pendency of another court action. Courts in several circuits have held under A) a Continuing Violation Rule tort or B) a conspiracy, may serve as grounds for equitable tolling in civil RICO cases.** In this matter, the statute of limitation started to run when the Plaintiff filed his RICO complaint, **giving up on litigating** his remaining Florida court cases because of the expression, **"It's a rigged system."**, stated by Donald Trump in 2016, and he would have known as well as anyone after years of courting the **upper echelons** of the political system in America before his name was allowed to be placed on any ballot.

The Continuing Violation Rule and the Last Predicate Act Rule are applicable in this matter because of the following:

Mr. Schneider's most resent court case injuries were on **12-27-19** for Mr. Schneider's **$1,060,000** from respectively appellate case

**2D19-1384** from 17-CA-4051; on **1-24-19**, appellate case **2D18-4761**, from case **18-CA-1537** for Mr. Schneider's **$15,000** and on **10-28-19** for both Mr. Schneider's **$6720**, and for Ms. Kimball's **$239,724** in case **17-CA-6219**. All of these cases are either respectively just affirmed on appeal, illegally stopped or still in litigation.

**35.   A More General Analogy of the Applicable Rules in this Matter for Determining Whether a Party is Within the Statute of Limitations under the Civil RICO Act, Outside of a 1) Murder or 2) a Fraud on the Court:**

**A.**   A VICTIM HAS FOUR YEARS TO FILE SUIT FROM THE TIME OF AN INJURY TO ONE'S BUSINESS OR PROPERTY THAT SHOULD HAVE BEEN KNOWN WAS FROM AN ENTERPRISE'S RACKETEERING.

**B.**   AND AN ENTERPRISE IS DEFINED AS HAVING AT LEAST THREE STRUCTURAL FEATURES:  1) A PURPOSE, 2) LONGEVITY SUFFICIENT TO PERMIT ITS ENTITIES TO PURSUE THE PURPOSE OF THE ENTERPRISE AND 3) A STRUCTURE DISTINCT FROM THE RICO PREDICATE ACTS, SHOWING THAT THE INJURY WAS CAUSED BY AN ENTERPRISE.

**C.**   THE STATUTE OF LIMITATION FOR FILING A COMPLAINT UNDER THE RICO ACT IS TOLLED WHEN AN ENTERPRISE OR ASSOCIATION INTENTIONALLY CONCEALS HAVING COMMITTED AN **EXTRINSIC FRAUD**, TO PREVENT THE KNOWLEDGE NEEDED FOR ONE TO LEGALLY SEEK COMPENSATION FOR DAMAGES UNDER THE RICO ACT.

D.   **EQUITABLE TOLLING** IS GRANTED WHEN THE STATUTE OF LIMITATIONS ON THE CORRECT REMEDY HAS NOT BEEN PURSUED, IF ONE CAN SHOW REASONABLE GOOD FAITH CONDUCT OF HAVING ACTIVELY PURSUED A LEGAL REMEDY, BUT WAS **MISLED** (GIVEN SOMEONE THE WRONG IDEA OR IMPRESSION) BY A DEFENDANT OR CO-CONSPIRATOR ABOUT THE CAUSE OF ACTION NEEDED TO BE TAKEN WHICH PREVENTED ONE FROM RELIEF UNDER THE RICO ACT.   THE EQUITABLE TOLLING DOCTRINE, AS IT RELATES TO THE RICO ACT, **DOES NOT REQUIRE WRONGFUL CONDUCT ON THE PART OF A DEFENDANT OR CO-CONSPIRATOR SUCH AS FRAUD OR MISREPRESENTATION, BUT EQUITABLE ESTOPPEL DOES.**   American Jurisprudence 2d Limitation of Actions § 174 (2007).

E.   AND **EQUITABLE ESTOPPEL** IS GRANTED FOR TOLLING THE STATUTE OF LIMITATIONS WHEN:

1.   THERE WAS REPRESENTATION OR CONCEALMENT OF A FACT OR FACTS,

2.   THE FACT OR FACTS WERE KNOWN BY THE DEFENDANT AT THE TIME OF THE REPRESENTATION OR CONCEALMENT,

3.   THE REPRESENTATION OR CONCEALMENT WAS MADE WITH THE INTENTION OR EXPECTATION THAT IT WAS GOING TO BE ACTED UPON,

4.   THE REPRESENTATION OR CONCEALMENT WAS ACTED UPON,

5.   THE PLAINTIFF WAS INJURED.

36.   **Applicable Laws from Different Federal Circuits Regarding the Statute of Limitations under the Civil RICO Act:**

In *Rotella v. Wood* 528 US 549 - 2000, **the Supreme Court failed to decide "whether civil RICO allows for a cause of action when a second predicate act follows the injury," because such facts did not exist in that case**. Under the traditional federal accrual principle, a statute of limitation period does not begin to run until the cause of action is **complete**. See, e.g., *Rawlings v. Ray*, 312 U.S. 96, 98 (1941) and *Clark v. Iowa City*, 87 U.S. 583, 589 (1874). Some courts have incorporated this traditional principle into the injury discovery rule, **holding that a pattern of racketeering must exist, even if racketeering is believed,** before the limitations period begins to run and **avoiding the *Rotella* "quandary" altogether (the *Rotella* case did not have the required two (2) RICO predicate acts committed under Section § 1961(5), if there was even one committed.** See, e.g., *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F. 3d 797, 802 **(7th Cir. 2008)** and *Bygrave v. Van Reken*, 238 F. 3d 419 (6th Cir. 2000) (unpublished table decision) **(Avoiding the *Rotella* quandary because injury and two alleged predicate acts occurred over four years before plaintiff filed RICO claim)**; *Grimmett v. Brown*, 75 F. 3d 506, 512 (9th Cir. 1996) **("[b]ecause a RICO cause of action cannot accrue until all the elements exist, no statute of limitations can begin to tick until a pattern exists")** (citation omitted); *McCool v. Strata* Oil Co., 972 F. 2d 1452, 1465 (7th Cir. 1992) **(though injury discovery rule**

168

applies, "[t]here must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury"). Agency Holding v. Malley-Duff, 483 U.S. 143 (1987). Since this case, **the federal courts have uniformly upheld the application of federal equitable tolling and equitable estoppel.**

37.   **How and When the Plaintiff Discovered that His Million Dollar Plus Property Injury was the Result of Racketeering:**
In this complaint there were, **and still are, four (4) distinct enterprises that defrauded the Plaintiffs out of money owed.** Consequently all four enterprises' actions have to be examined separately in determining when, to a diligent person, their participation was done in violation of Title 18, Chapter 96, Section 1962(c).

38.   **The Defrauding Tactics Used by the Primary Enterprise With Regards to What the Plaintiff Should Have Known and When:**
Cyrie Schneider was the murdered decedent's live in caretaker and accountant, who started to kill the decedent 7 months before her death on 7-1-12 as a means of making her completely incompetent in order to extract signed inheritance instruments (contracts) out of her, which she did on 6-29-12. Instruments that were **not** standard form inheritance contracts, but extremely

detailed, taking hours for Robert Welker to iron out **with Cyrie Schneider present, along with when the gift deed instrument was going to wrongly be delivered to the Plaintiff.** These were inheritance instruments that **Cyrie Schneider** <u>**technically wrote**</u> and authorized Robert Welker to compile and format by placing the decedent's forged signature on his retainer agreement and then paid him with one of the decedent's forged checks. This plan was used as a means to cut the Plaintiff out of $250,000 worth of inheritance property from the decedent's estate. When Cyrie Schneider had achieved what she wanted to accomplish, she was very much guilty of aggravated manslaughter under Florida Statute 782.07, and having violated Florida Slayer Statute 732.802. **Cyrie Schneider had killed the decedent to defraud the Plaintiff out of $250,000 worth of property under the Florida intestate laws!** Hindsight being 20/20, Cyrie Schneider's plan to abuse, neglect, exploit and murder the decedent, if need be for more profit, was known to the decedent's other two (2) greedy and coldblooded caretakers before the decedent's death. The Plaintiff had confirmation of this when he discovered in 6/2016 an extortionate credit transaction from one of the decedent's bank accounts with Marcy McDermott name also on this account which was credited by Cyrie Schneider on 6-12-12 for $20,000. **It was important for Cyrie Schneider to move the decedent's bank account money around before the decedent's**

death, because all of the joint account holders anticipated inheriting the decedent's property after her death by way of a false will that stated in it that any of her joint bank account holders had the right to the remaining money, thus cutting the Plaintiff out of his inheritance.

If a another one of the decedent's caretakers had conspired to divided the decedent's property behind her back before she was dead due to being too sick and incompetent to have known or cared, more than one of the decedent's caretakers also knew that the decedent was being mentally and physically compromised in order to be taken advantage of by another, but could have cared less.  So more than one of the decedent's caretakers decided to profit from the decedent being abused and neglected until she was dead.  Undoubtedly, more than one of the decedent's caretakers also knew that the decedent was too incompetent to have signed any inheritance instruments 17 days later on 6-29-12, two (2) days before she died from sepsis and/or septic shock!  So Sybil Murphy and Cyrie Schneider singed false affidavits for Thomas Rydberg's summary judgment motion, case 12-CP-1669, on 3-20-13, when they stated that the decedent was competent when she was out of her mind from sepsis.

Around 6/2016, about a month after Mark Wolfe had granted in part an order on 5-18-16, from case 14-CA-12257, allowing the Plaintiff to subpoena bank account information on the decedent's

banking records, but wrongly only allowing the Plaintiff to go back one year from her murder, he saw a fraudulent transaction made when the decedent was too sick and out of her mind to have been thinking about who to leave her property to when she wanted to die intestate. **The decedent assumed that her joint bank account holders would divide her property evenly amongst <u>all</u> of her heirs.** And quite possibly, the caretakers' intentions to fleece the decedent while they slowly killed her, was known to Robert Welker, the caretakers' attorney. **The confirmation of any information about the relationship between the decedent's caretakers and how they were involved in the decedent's murder, were unknown to the Plaintiff due to concealment fraud. Although the Plaintiff had diligently tried to get this information during Sybil Murphy's deposition on 4-19-13, case 12-CP-1669, taken by primary enterprise member Lee Pearlman, he was defrauded out of acquiring the information by Lee Pearlman.** So the Plaintiff did not believe that anyone else was involved in the murder of the decedent before 6/2016, but Cyrie Schneider. During case 12-CP-1669, all that the Plaintiff knew, and could diligently find out, was that Cyrie Schneider had been killing the decedent for the last 7 months of her life alone and without any of the other caretakers' knowledge by giving the decedent critical/lethal amounts of potassium to stop her heart while substituting an antifungal for her pneumonia medication.

And Cyrie Schneider cleverly refrained from taking the decedent to a doctor where these illegal acts might have been discovered and documented. The Decedent died from severe sepsis and/or septic shock due to untreated pneumonia and critical levels of potassium, both of which stopped her heart from beating, as documented by Florida Hospital. The decedent's cause of death from Florida Hospital was not affirmed by the Hillsborough County Coroner's Office in Tampa, Florida. This coroner's office wrongly stated that the decedent died from natural causes, after being pressured from HCSO into doing so. During case 12-CP-1669, the Plaintiff never thought that the decedent's murder was the work of an enterprise, but a poor, greedy and vindictive relative without a moral conscience.

As for Robert Welker being partners with Cyrie Schneider in an association in fact enterprise, depends on what Robert Welker knew before he indirectly helped kill the decedent by giving Cyrie Schneider two (2) false inheritance instruments around 3/2012 to cram down her throat for months before her death on 7-1-12, 9pm, and then used the instruments in 7/2012 to probate her estate for more blood money! **Unfortunately, anyone in America can legally pay an attorney to draft a standard inheritance instrument for someone else, as long as they sign a retainer agreement and pay the attorney's drafting fee. It is illegal to 1) add to a standard inheritance instrument what it**

is <u>you want in it</u>, **communicated verbally or in writing to the attorney drafting it, or to 2) forge someone else's name on a retainer agreement for services to be rendered.**  A family procuring a <u>standard</u> will instrument from an attorney for one of their relative is currently not a racketeering activity under the Civil RICO Act, but it should be.  Hindsight being 20/20, the Plaintiff believed in 6/2016 that the decedent's three (3) caretakers had already formed the primary enterprise before Cyrie Schneider had killed the decedent.  **What the Plaintiff found out from 3/2016 to 6/2016, gave him an uneasy feeling that he had been fooled in case 12-CP-1669 by everyone in it, including his attorney.  And that fraud had been committed under the Civil RICO Act by both a primary and a secondary enterprise. These were the Plaintiff's <u>storm warnings</u>.**

All of the RICO predicate acts in Section 7 of this complaint were committed by the primary enterprise.  When Sybil Murphy became an agent for the primary enterprise in court case 12-CP-1669, she as well as cyrie Schneider and Robert Welker participated in it under Title 18, Chapter 96, Section 1962(d) by filing knowingly false affidavits on 3-20-13.  Thus, the primary enterprise also had its defrauding hand in case 12-CP-1669, but the Plaintiff had no way of knowing this until he could gather more information on what had happened to all of the decedent's money prior to her murder.  **If you want to find out**

174

**who else was involved in a money crime, you have to follow the money trail and the Plaintiff got lucky in 6/2016.**

When Robert Welker filed false documents to probate the decedent's estate, case 12-CP-1669, he became an agent for the primary enterprise under Title 18, Chapter 96, Section 1962(d). And when Robert Welker had his good friend Thomas Rydberg illegally litigate case 12-CP-1669 in the best interests of the primary enterprise, he too became an agent (facilitator) in it under Title 18, Chapter 96, Section 1962(d). A fraud on the court was committed twice when both Robert Welker and Thomas Rydberg filed false documents respectively for opening and litigating probate. Consequently, the primary enterprise intended for their false final order submitted to the court after a summary judgment motion filed on 3-20-13 and heard on 5-6-13 to be signed by Robert Foster on 5-15-13, case 12-CP-1669. This final order defrauded the decedent under Title 18, Chapter 96, Section 1961(1), specifically Title 18, Chapter 63, U.S. Codes § 1341 (mail), 1343 (wire) and 1346 (honest services fraud). At this point in time, no monetary injury to the Plaintiff had yet occurred and no honest services were denied to either the decedent or the Plaintiff. On 5-15-13, when Robert Foster signed the false final order, he was a participant in the secondary enterprise (state judicial enterprise) who had committed racketeering on the decedent. The Plaintiff believed

he had lost probate case 12-CP-1669 because of **1)** Lee Pearlman's negligence for not filing the Plaintiff's affidavit refuting the allegations in Thomas Rydberg's affidavits filed in support of his summary judgment motion and **2)** for not objecting to the false final order submitted to the court prior to its signing by Robert Foster.

When Thomas Rydberg came up with the plan to somehow coerce (bribe) the Plaintiff's attorney Lee Pearlman under Title 18, U.S. Code § 201(b)(3), and he accepted under Title 18, U.S. Code § 201(b)(4) right before Sybil Murphy's deposition on 4-19-13, case 12-CP-1669, they had both participated under Title 18, Chapter 96, Section 1962(d), but still no monetary injury to the Plaintiff's business or property had occurred.  And the Plaintiff believed he would be court awarded both his inheritance as well as 1/3 of Cyrie Schneider's inheritance under Florida's Slayer Statute 732.802 during case 12-CP-1669. This amount would have been around $333,000.

When opposing parties along with Lee Pearlman, Thomas Rydberg and Robert Welker during case 12-CP-1669, knew that the primary enterprise's plan was **not** to talk about the decedent's murder in court and just have Lee Pearlman **not** file a rebuttal pleading (affidavit) to refute the summary judgment motion's allegations (affidavits) during the hearings on 5-6-13 and 7-29-13, with Thomas Rydberg drafting and filing the bogus final order,

including in it a statement about the Plaintiff's murder count having been abandoned that Robert Foster would sign, **all opposing parties and their attorneys along with lee Pearlman were primary enterprise RICO participants under Title 18, Chapter 96, Section 1962(d).**

When Robert Foster signed the final order in case 12-CP-1669 <u>with prejudice</u> on 5-15-13 and when the concealment fraud (extrinsic fraud) had finished on 7-29-13 (second summary judgment rehearing), all opposing parties and Robert Foster, were in violation of Title 18, Chapter 96, Section 1962(c) for respectively defrauding the Plaintiff as to where the decedent's property was going (committed by opposing parties and their counselors along with Lee Pearlman) and in defrauding the decedent out of an investigation into her murder under Florida statute 732.802 (committed by <u>Robert Foster</u>, opposing parties and their counselors along with Lee Pearlman).  What ended case 12-CP-1669 was Lee Pearlman not objecting to allegations that opposing parties introduced as being factual.  And the fact that the decedent was murdered only had monetary merit to the Plaintiff if case 12-CP-1669 was still open and in litigation.

<u>The Plaintiff had no way of knowing that he had been monetarily injured under the Civil RICO Act because the RICO plan was an extrinsic fraud that covered up the fact that Lee Pearlman was not negligent, but a member of the primary enterprise, whose job</u>

it was not to file a rebuttal affidavit, along with Robert Foster's job, as a secondary enterprise member, to make sure the Plaintiff's will contest (case 12-CP-1669) never made it to trial. Robert Foster did not have to end case 12-CP-1669 illegally as a member of the secondary enterprise when Lee Pearlman refused to adequately work the case. The Plaintiff had determined on 3-8-16 the real reason for his having lost case 12-CP-1669. The statute of limitations for filing a RICO complaint is tolled for concealment fraud which purposely stops a party from receiving information to correctly litigate a claim for damages.

Hindsight being 20/20, during case 12-CP-1669, Robert Foster knowingly aided and abetted in the Plaintiff being defrauded by the primary enterprise in his court under Title 18, U.S. Code § 3 as a member of the secondary enterprises by being in violation of Title 18, Chapter 96, Section 1962(d) (Pinkerton Liability Doctrine) up until 5-14-13. And Robert Foster was in violation of Section § 1962(d) for committing honest services fraud under Code § 1346 by not ordering an investigation up until 5-14-13 into the murder of the decedent. On 5-15-13, Robert Foster did not have to investigate the decedent's murder because case 12-CP-1669 was legally dismissed under the umbrella of Lee Pearlman's negligence act. Despicable! By Lee Pealman (primary enterprise member) 1) never having filed a rebuttal affidavit

during case 12-CP-1669 and 2) having <u>failed to object to Thomas</u> <u>Rydberg's proposed final order before Robert Foster signed it on</u> <u>5-15-13</u>, the secondary enterprise (Robert Foster) <u>legally</u> dismissed this case because of Lee Pearlman's negligence act, but <u>illegally</u> dismissed the case because the final order was with <u>prejudice that covered up the decedent's murder permanently</u> <u>in probate court</u>. So Robert Foster and his state judicial enterprise did not need to defraud the Plaintiff, just dismiss case 12-CP-1669 legally and violate the decedent's civil rights by covering up her murder to keep the Plaintiff from coming back into his court to try the case later on by signing the false final order that both parties agreed to <u>with prejudice</u>.  <u>It did</u> <u>not matter to Robert Foster that the decedent was murdered, when</u> <u>he had a legitimate reason for dismissing case 12-CP-1669 and</u> <u>shunning his responsibility to her</u>.  <u>The racketeering on the</u> <u>Plaintiff was committed under Title 18, Chapter 96, Section</u> <u>1962(c) by Lee Pearlman and the primary enterprise</u>.  The Plaintiff's attorney was at fault for not wanting to litigate case 12-CP-1669.  In the transcript from the 7-29-13 rehearing on the summary judgment motion, case 12-CP-1669, page 4, line 25, Lee Pearlman states "Now, I'm not saying it's not right for a judgment of acquittal"; page 14, line 23, the judge acts like he does not remember the three counts from this case and says "is he claiming undue influence?".  Then he implies that the

Plaintiff has to wave his undue influence claim in order to proceed to trial, saying "So he doesn't want to do that. Isn't that a condition to proceeding?". __Both Robert Foster and Lee Pearlman knew how to play it dumb when defraud a victim__! It was not enough for Lee Pearlman __not__ to have filed a rebuttal affidavit in response to Thomas Rydberg's summary judgment motion __allegations__ (no factual statements), Lee Pearlman had to agree with the allegations as being factual to insure that Robert Foster would dismiss the case regardless of the allegations __not__ having been based on any material facts!  At this point, Robert Foster should have 1) dismissed the motion or 2) simply suspended the case and told the Plaintiff to find another attorney within 60 days, but he was required to dismiss this case permanently with __prejudice__ any way he could per his orders from Manuel Menendez.  If you read the transcripts from 5-6-13 and 7-29-13, no judge, not even Robert Foster, could have been this negligently, but perhaps he was.  Who can say that Robert Foster committed a clear abuse of discretion in dismissing case 12-CP-1669 when Lee Pearlman failed to adequately work the case?  No one.

39.  The Formation of the __Secondary and Third Enterprises__ in this Matter With What the Plaintiff Should Have Known and When:

Right after case 12-CP-1669 had ended, the Plaintiff filed case 14-CA-10278 which was a tortious interference with inheritance case, not a continuation of probate case 12-CP-1669. Where the decedent's property was going had already been decided (in rem) in case 12-CP-1669. Case 14-CA-10278 was against Robert Welker and the decedent's personal representative Sybil Murphy from case 12-CP-1669. Thomas Rydberg was hired by Robert Welker, and paid by CNA Insurance Company (third enterprise) as their agent to file false documents, claiming a violation of the collateral estoppel rule (count preclusion) had occurred, with the Plaintiff already having had his bite at the apple for acquiring the decedent's property in case 12-CP-1669.

Opposing parties with their attorney Thomas Rydberg, as well as Manuel Menendez and Kimberly Cash from the 13th Judicial Circuit, all solicited Bernard Silver with fraudulent statements to commit a fraud on the court. And he did so, illegally dismissing case 14-CA-10278 once (1) with prejudice on 2-6-15 under Title 18, Chapter 96, Section 1962(c) as a member of the secondary enterprise for the Plaintiff supposedly violating Florida Statute §733.103(2), **when Robert Welker was clearly not party to probate case 12-CP-1669** and **the Plaintiff was clearly not suing Sybil Murphy again for where the decedent's property was going**. The Plaintiff had no way of knowing that Bernard Silver was working for the secondary enterprise when he

defrauded him, monetarily injuring him in his property interest
on 2-6-15.

On 2-6-15, Bernard Silver committed violations under Title 18,
Chapter 63, U.S. Codes § 1341, 1343 & 1346, but since this fraud
on the court could have also been implemented by Manuel Menendez
and Kimberly Cash when they slandered the Plaintiff with Bernard
Silver per quod around 1-6-15, **the Plaintiff could not discern
the nature (underlining purpose) behind Bernard Silver having
illegally dismissed case 14-CA-10278 on 2-6-15 other than it was
for spite sake.** Either the Plaintiff illegally lost case 14-CA-
10278 on 2-6-15 because Bernard Silver wanted to spite him (more
likely), or because Manuel Menendez's office instructed Bernard
Silver to do so as a member of their enterprise out to defraud
the Plaintiff in his property interest as a favor to HCSO.
**There was no way for the Plaintiff to have suspected a
racketeering activity had been committed during court case 14-
CA-10278 by an enterprise out to injure him until a second (2)
RICO predicate act was committed on him by either Bernard Silver
or another judge within the secondary enterprise (state judicial
enterprise).** At this point in time, the Plaintiff knew nothing
about a conspiracy between HCSO and the 13th Judicial Circuit in
which HCSO wanted all of the Plaintiff's cases damage out of
revenge (something of value). The Plaintiff only knew that on
1-6-15, the local courthouse had slandered him with Bernard

Silver and the Plaintiff was being asked by Bernard Silver in court on this day to admit to having made derogatory remarks to the chief judge's office concerning his religion. **There was no way for the Plaintiff to have known that heavy handed Bernard Silver had violated the Plaintiff's civil rights on 2-6-15 as a member of the secondary enterprise other than he wanted to damage the Plaintiff monetarily in case 14-CA-10278 for supposedly insulting his nationality behind his back.** **Hindsight being 20/20, Bernard Silver's having yelled in anger at the Plaintiff on 1-6-15, was a ruse to make the Plaintiff believe that when he illegally dismissed case 14-CA-10278 on 2-6-15, it was done for spite sake and not because the chief judge's office had instructed him to do so**. Even though Lee Pearlman was to blame for the Plaintiff having lost case 12-CP-1669, the Plaintiff did not trust the 2DCA for affirming the **entire** ruling made on 5-15-13, from case 12-CP-1669, case 2D13-4571, filed by Lee Pearlman, and affirmed on 6-6-14, when a murder had occurred.

And since the Plaintiff did not want to waste his time questioning Bernard Silver in his court to try and get to the bottom of why he had illegally dismissed case 14-CA-10278 in the hopes of somehow having his final order correctly voided, he chose to try having Bernard Silver's ruling made on 2-6-15 reversed in federal court, case 8-17-CV-219-7-36MAP, U.S. Middle

District of Florida, under Title 42, Chapter 21, Section 1983 for depriving him of his right to sue Robert Welker and Sybil Murphy for tortious interference with inheritance in case 14-CA-10278. If the Plaintiff could have been court awarded his property interest during case 14-CA-10278, he would not have written this complaint. **Even though the Plaintiff thought that Bernard Silver's false ruling made on 2-6-15 was due to Kimberly Cash and Manuel Menendez having spited him themselves using Bernard Silver, his only option was to sue Bernard Silver in federal court, under Title 42, Chapter 21, Section 1983 for a reversal of his ruling. <u>A couple of people making a false allegation to a judge about a party to spite him or her one time for the pleasure of injuring the party in their property or business, is not racketeering under the RICO Act</u>.** At this point in time, the Plaintiff was going to sustain a monetarily injured in his property by the one (1) clearly illegal ruling made by Bernard Silver on 2-6-15, if he did not take further legal recourse, but the plaintiff did not know that the cause of this clear abuse of discretion was other than for spite sake due to the Plaintiff having made complaints starting in 12/2014 to the chief judge of the 13th Judicial Circuit (Manuel Menendez) about no one at Bernard Silver's office answering the telephone for weeks, which had nothing to do with Bernard Silver's nationality.

184

**The RICO predicate act committed in conjunction with Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346, case 14-CA-10278, is tolled under the equitable tolling doctrine due to the Plaintiff having been diligent in the pursuit of justice while being <u>misled</u> into believing that the false ruling on 2-6-15 by Bernard Silver, court case 14-CA-10278, was due to spite.**

Then in case 8-17-CV-219-7-36MAP, when Charlene Honeywell illegally dismissed the Plaintiff's complaint on 5-9-17 against Bernard Silver (a Section § 1983 case), she participated as a member of the secondary enterprise under Title 18, Chapter 96, Section 1962(c) by defrauding the Plaintiff out of his property interest from case 14-CA-10278, when she violated Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346.

**When Charlene Honeywell had also monetarily injured the Plaintiff in his property on 5-9-17, it was the second (2) <u>known</u> RICO predicate act committed by a judge (secondary enterprise) on the Plaintiff which continued to injury him in his property interest from case 14-CA-10278.  The Plaintiff already knew on 3-8-16 that there was one (1) injury to his property interests that had been committed on him by the primary enterprise, injuring him on 5-15-13 in probate court, case 12-CP-1669.** Hindsight being 20/20, Bernard Silver did in fact defraud the Plaintiff out of property owed to him in case 14-CA-10278 under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346 as a

participant in the secondary enterprise under Title 18, Chapter 96, Section 1962(c), **but concealed this fact well by yelling at the Plaintiff on 1-6-15 for supposedly disliking his religion.**

**For simplicity sake in analyzing how the statute of limitations under the Civil RICO Act relates to this matter even though it is tolled indefinitely under both 1) fraud on the court and 2) AATF in a murder under U.S. Code § 1959, on both 3-8-16 and 5-18-16 the Plaintiff figuring that he had, and still was, being defrauded out of his property interest by two different enterprises, respectively by the decedent's caretakers (primary enterprise) and by Florida state judges (secondary enterprise) for two (2) different reasons.**

**40.   The Details of How the Plaintiff Concluded on 3-8-16 and 5-18-16 that He had been Defrauded under the Civil RICO Act Respectively in Cases 12-CP-1669 and 14-CA-10278:**

The Plaintiff filed suit on Lee Pearlman, case 14-CA-12257, for committing malpractice during case 12-CA-1669 and Florida Lawyers Mutual Insurance Company was his malpractice insurance carrier during cases 12-CP-1669 and 14-CA-12257. In the beginning of 3/2016, case 14-CA-12257, the Plaintiff started filing subpoenas on Lee Pearlman, Thomas Rydberg and the decedent's former banking institutions to acquire detailed

banking records from each, **but on 3-8-16, Thomas Rydberg made the huge mistake of not only representing his law firm and Sybil Murphy, but unofficially representing Lee Pearlman's interests without Lee Pearlman showing up for court!** This was a slap in the Plaintiff face **(wakeup call!)** and he quickly reevaluated the reason for his having lost case 12-CP-1669 and concluded that **Thomas Rydberg had somehow coerced (bribed) Lee Pearlman into throwing case 12-CP-1669.** Thomas Rydberg not only wanted to keep his banking records on the decedent confidential from the Plaintiff, but also wanted to help the one (1) person who had helped him illegally win case 12-CP-1669. **This was a kind of reckless oversight that most attorneys make when they feel that their illegal actions committed during court cases are above the law. And the Plaintiff had his suspicions about what Thomas Rydberg illegally did in case 12-CP-1669 to win it when he started representing Lee Pearlman's interests in case 14-CA-12257 without a notice of appearance filed.**

Hindsight being 20/20, the primary enterprise had gotten away with defrauding the Plaintiff out of his inheritance during case 12-CP-1669 when the decedent's three (3) caretakers made rich Sybil Murphy the personal representative to the decedent's estate to fight the Plaintiff, and she in turn paid agent Thomas Rydberg to win for the primary enterprise. He did this by soliciting Lee Pearlman to throw case 12-CP-1669. This was

accomplished when **1)** Lee Pearlman failed miserably to ask Sybil Murphy **any relevant questions** during her deposition, taken on 4-19-13, case 12-CP-1669 when Cyrie Schneider was the one who had murdered the decedent.   And **2)** by not filing the Plaintiff's affidavit refuting Thomas Rydberg's summary judgment motion affidavits during case 12-CP-1669.   The Plaintiff lost case 12-CP-1669 with prejudice and believed that Lee Pearlman was to blame for being negligent and sued him in case 14-CA-12257 for malpractice.   **There was no way for the Plaintiff to have known that Lee Pearlman was working for the primary enterprise by** not **deposing Cyrie Schneider and failing to file a rebuttal affidavit at least 48 hours before the two (2) summary judgment motion hearings, who planned on defrauding the Plaintiff twice (2) in court to keep him from acquiring his stolen inheritance property.**   In the probate final order dated 5-15-13, case 12-CP-1669, written by Thomas Rydberg and signed by Robert Foster, it states that the petitioner's (Plaintiff's) third claim (Florida slayer statute 732.802) was abandoned.   **Abandoned means to castoff or discontinue for a time.**   When the Plaintiff read this in the final order, he did not know why he was reading it or what it meant.   **Lee Pearlman in court on 7-29-13, page 15 of the filed transcript, case 14-CP-12257, summary judgment rehearing, states "we're only going forwards on the two counts.", after taking about the Plaintiff withdrawing his undue influence count**

and agreeing to wave this count.  Again, the Plaintiff did not know why he was hearing this or what this statement meant since both his incompetency and undue influence counts had supposedly ended on 5-15-13 (hearing on 5-6-13).  This was a _ruse_ by Lee Pearlman to make the Plaintiff believe that on 7-29-13, his slayer statute count was _not_ permanently over with so he would not make a scene in court with a court reporter present.  _No one ever stated in court on 5-6-13 anything about the slayer statute count prior to the signing of the final order on 5-15-13!  And there had to be an affidavit filed by opposing parties detailing any reason for this count being dismissed during the summary judgment motion or its dismissal was in violation of the Four Corners rule!_

**_The Plaintiff contends that Robert Foster should have never agreed to hear Thomas Rydberg's summary Judgment motion because of the following:_**

A motion for summary judgment should be granted when there is **no genuine issue of material fact** (relevancy) and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); _Celotex Corp. v. Catrett_, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In other words, Robert Foster thought that there was **1)** no real relevancy in the decedent dying from septic shock when she was being negligently cared for, **2)** the decedent's signature having been forged on Robert

189

Welker's retainer agreement to draft the false inheritance instruments, **3)** the decedent's pneumonia medicine not found in her system, **4)** only $1,200 in the decedent's estate and **5)** no explanation given by opposing parties to any of these facts stated in the Plaintiff's petition. **Was there something in the water Robert Foster was drinking or was he just racketeering? Most Florida trial judges illegally allow summary judgment motions before discovery has finished to defraud parties out of their day in court, basing their illegal dismissals only on unproven allegations!**

**The beauty of Thomas Rydberg's plan of introducing a summary judgment motion before discovery had really started, was to 1) stop the Plaintiff from proving absolutely to the court that the decedent was murdered.  And to 2) stop Robert Foster from having to order an investigation into the decedent's murder using law enforcement (HCSO), which both Robert Foster and the primary enterprise did not want to accommodate.** So Robert Foster heard the summary judgment motion before discovery had really started by Lee Pearlman having failed to depose Cyrie Schneider to ask her why she committed aggravated manslaughter on the decedent. **Lee Pearlman was worse that a negligent attorney.  Who needs enemies when you have Lee Pearlman representing you!**

Anything Lee Pearlman did as part of a negotiated arrangement he had with Thomas Rydberg (defense counsel) behind the Plaintiff's

back that dismissed any part of the Plaintiff's petition in probate case 12-CP-1669 without the Plaintiff knowing or permitting it, injuring him in his property interest, is considered an extrinsic fraud. **By Lee Pearlman not having argued this issue after reading the proposed final order, he was undeniably part of the extrinsic fraud, _if_ he was not just plain negligent.** Thomas Rydberg having represented Lee Pearlman's interests in court, case 14-CA-12257, on 3-8-16, **without Lee Pearlman present**, resulted in the Plaintiff filing "Amended Complaint 4-15-17" in case 14-CA-12257. **By beyond reasonable doubt evidence, Thomas Rydberg and Lee Pearlman were members of the primary enterprise during case 12-CP-1669. <u>The jig was up on 4-15-17, so Thomas Rydberg stopped representing Lee Pearlman interests in case 14-CA-12257</u>.**

Because of the **extrinsic fraud** committed during case 12-CP-1669 by opposing parties, which also included Robert Welker, Thomas Rydberg and Lee Pearlman, the Plaintiff could not determine until 3-8-16 during case 14-CA-12257, that he had been defrauded by at least one (1) enterprise, but all he could do then was amended his complaint on 4-15-17, case 14-CA-12257, to include fraud counts. The Plaintiff also file a separate fraud complaint around 4-15-17 against Thomas Rydberg, Lee Pearlman, Robert Welker and Sybil Murphy, case 17-CA-4051, but in congruence with the statute of limitations, excluding a fraud on

the court or an AATF in a murder, he had to file a RICO complaint before 3-8-20.

**The Plaintiff knew after 3-8-16 that if there was one more RICO predicate act committed by the secondary enterprise to defraud him in any of his property or business interests within the unlucky 13, 13th Judicial Circuit after Bernard Silver did so in case 14-CA-10278, Bernard Silver absolutely did not defraud the Plaintiff for spite sake, but because the chief judge's office at the 13th Judicial Circuit asked him to do so as a secondary enterprise member!** The Plaintiff knew that this was the case when William Levens defrauded him on 4-6-16, case 14-CA-12257. Both judge William Levens and Thomas Rydberg were co-conspirators out to defraud the Plaintiff and did so when they stopped the Plaintiff from obtaining all of the decedent's banking documents, case 14-CA-12257.  The Plaintiff felt the storm warnings on **1)** **3-8-16** by Thomas Rydberg representing Lee Pearlman in case 14-CA-12257; **2)** on 4-6-16 by William Levens' false order in case 14-CA-12257; **3)** on 5-18-16 by Mark Wolfe's false order in case 14-CA-12257 and **4)** on 6/2016 by Marcy McDermott being paid off for her part in the decedent's neglect, exploitation and murder cover-up.  These were the storm warnings that convinced the Plaintiff that Lee Pearlman was coerced by Thomas Rydberg into **not** filing an affidavit refuting the

allegations made in the summary judgment motion affidavits during case 12-CP-1669 to benefit at least one (1) enterprise. Hindsight being 20/20, the Plaintiff had confirmation of local courthouse judges defrauding him as part of a secondary enterprise when both William Levens and Mark Wolfe also signed false orders respectively on 4-6-16 and 5-18-16, defrauding the Plaintiff as two more judges from the 13th Judicial Circuit with Thomas Rydberg once again providing the **government function** of assisting with the needed bogus motions filed for two more presiding 13th Judicial Circuit judges to make two more clearly false ruling on!  The Plaintiff knew by 6/2016 that he had until around 3-8-20 to prove on paper what he needed to in order to file a RICO complaint under the Civil RICO Act against the primary, secondary and third enterprises seeking compensation for damages from cases 12-CP-1669 and 14-CA-10278 due to racketeering and not respectively negligence or a onetime spiting as first thought.  The reason for the pro-se Plaintiff not having filed under the RICO Act sooner is because he had **other legal recourse available** since the clear abuse of discretions used to injure him under the RICO Act, were still rectifiable, if he chose to litigate any further.  The Plaintiff also had to educate himself on the current Civil RICO Act rules which took time.  And the Plaintiff wanted to play along with the clearly obvious and pathetic enterprises already involved to

see how many more crooked judges, attorneys and insurance agents would look into the Plaintiff's case files to see what the score was, talk to the agents involved who had already injured the Plaintiff, and decide to gladly jump on the band wagon (participate) in defrauding the Plaintiff some more.  Thus, numerous new RICO predicate act were committed **validating** the pattern and purpose of the prior RICO activities that defrauded the Plaintiff out of his business and property interests.  **And the Plaintiff also wanted to find out if there was at least one honest American judge with enough moral conviction not to participate in defrauding him.  If the Plaintiff had found one, you would not be reading this complaint!**

Damn the crooked American judicial system scam and the bar franchisor, Four Inns of Court at Crown Templar, that first introduced its bar scheme to the world centuries ago.  This organized enterprise knew how to maximize long term profits by putting their corrupted gang members into high level government positions while taking over countries.  From positions of power, they have been able to control media conglomerates, keeping their criminal activities from being aired to the public while spewing out disinformation.  What a racket!  Consequently, modern day Templars (banking syndicates and affiliates) have their bought and paid for American presidents, governors, attorney generals and chief supreme court judges, act as

pawnbrokers in their vast and varied scams to defraud citizens out of their property which grows the economy while the public grows ever poorer. The fact of the matter is, some of whatever the American government costs the public, eventually winds up in the Templars' packets. The more wrong judicial rulings trial judges make (antitrust), the more loot gets laundered by affiliates using commerce based schemes to wind up in the Templars' pockets. Consequently, the State of Florida allows its citizens to be defrauded by its state judges for increased profits and gains going to he Templars. Whether property is stolen, converted and then spent, or just spent, the Templars get a percentage due to the economics of the scheme growing the economy. And depressing the public enough to spend more also grows the economy. The more citizens get ripped off, the more the economy grows, and the more profits go into the Templars' pockets. Bastards! A song that comes to the Plaintiff's mind reflecting what the Templars have given the world when citizens need a loaf of bread to eat or some clean water to drink is "Welcome To The Jungle" by Guns N' Roses.

The Plaintiff sued Bernard Silver within two years (you have 4 years in Florida under Section § 1983) of his 2-15-15 signed ruling during case 14-CA-10278 in federal court, case 8-17-CV-219-7-36MAP, under Title 42, Chapter 21, Section 1983 for deliberately depriving him of his state and federal substantive

due process rights (civil rights) when he maliciously applied the wrong case law to his ruling.  Charlene Honeywell's ruling on 5-9-17 stated that Bernard Silver had not violated the Plaintiff's civil rights, **and did so without a jury trial**. **Fraud**!  Charlene Honeywell implied in her ruling that Bernard Silver did not commit a clear abuse of discretion, but had only erred on 2-6-15 and then illegally dismissed case 8-17-CV-219-7-36MAP!  The Plaintiff was once again misled into believing that perhaps he should have pursued another avenue.

The misled Plaintiff had already thought to file under Florida Rules of Civil Procedure (FRCP) 1.540(b)(1) to reverse Bernard Silver's 2-6-15 ruling, this time for supposedly being made in error during case 14-CA-10278, filed on 1-26-16, after Bernard Silver had retired and within a year from his final ruling (2-6-15).

On 5-9-17, the Plaintiff **new absolutely** that he had been injured monetarily in case 14-CA-10278 by a secondary enterprise consisting of Florida statewide judges.  And Charlene Honeywell was one of them, **but the Plaintiff still did not know who the organizers of the secondary enterprise were who had made the Plaintiff their patsy until around 1-1-18.**

After the 4-6-16 and 5-18-16 rulings, case 14-CA-12257, the Plaintiff went back to the beginning of his court battles with unfriendly and unethical judges at the 13th Judicial Circuit and

read the transcripts from cases 12-CP-1669, 14-CA-10278 and 14-CA-12257, and knowing what he already knew, saw a sneaky and underhanded pattern of fraud committed on him by district area judges and determined that every judge who had presided on one of the Plaintiff's court cases had ruled favorably on clearly fraudulent pleadings filed by opposing parties, but dismissed every clearly correct pleading with merit submitted to the court by the Plaintiff due to a **genuine conspiracy.**

**The doctrine of inquiry notice is said to trigger the limitations period once there are "storm warnings" sufficient to alert a reasonable investor of possible fraud committed after an injury occurs.** *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 F. App'x 695 (2d Cir. 2009) and Mathews, 260 F. 3d 239; *Isaak v. Trumbull Sav. & Loan Co.*, 169 F. 3d 390, 399 (6th Cir. 1999).

The 4 years to file under RICO depends on the plaintiff's ability to discover the injury rather than the predicate acts of fraud. *Love v. Nat'l Med. Enters.*, 230 F. 3d 765, 777 (5th Cir. 2000) **(emphasizing that the statute of limitations runs when the plaintiff has reasonable notice of his injury, not the fraud);** *Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243, 1249 (D. Haw. 2000) (stating that under the injury discovery doctrine, the focus is on the plaintiff's constructive notice of his injury, not on his awareness of the fraud. **Focusing on the**

plaintiff's knowledge of the <u>RICO fraud</u> is actually a form of the pattern discovery rule, which the Supreme Court rejected in *Rotella.* Tanaka v. First Hawaiian Bank, 104 F. Supp. 2d 1243 (D. Haw. 2000). **<u>If you do not know that a member of an enterprise has defrauded you in your business or property, you have no reason to suspect that the fraud was due to racketeering committed on you by an enterprise, unless you are told or have a sixth sense.</u>** **<u>And writing and filing a RICO complaint is extremely more difficult than a common law fraud complaint.</u>**

From cases:  14-CA-10278, on 2-6-15 (final order); 14-CA-12257, on 3-8-16; 16-CA-4693, on 5-2-17 (final order) and 8-17-CV-219-7-36MAP, on 5-9-17 (final order), the Plaintiff **knew absolutely** that the local district area judges were against his winning in any court case **as part of one large diabolically and unconscionable gang of monsters, but he still did not know who was ordering the travesty of false rulings or why.**

Sometime around 1-1-18, the Plaintiff **knew** who all of the crooks were involved in the secondary enterprise and why they were against him being awarded money owed by any court that they could influence.


**41.  Some Older, but Still Applicable RICO Case Laws Cited:**

Bernard Silver discriminated against the Plaintiff under (Title 42, Chapter 21, Section 1985(3), **in the context of this civil**

**RICO matter.** See *United States v. Beggerly*, 524 U.S. 38, 49 (1998) (Stevens, J., concurring); *accord Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) **(holding that timely filing of** discrimination claims **is "a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").**

In *Klehr* 521 U.S. at 194, the Supreme Court resolved the issue by holding that for the purposes of civil RICO, "'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" **The *Klehr* court** was silent **as to whether a plaintiff must also establish due diligence when asserting equitable estoppel on the grounds of non-fraudulent acts,** (e.g., murder and accessory after the fact (AATF) in a murder, both of which do not have a statute of limitations)**.** Plaintiffs arguing fraudulent concealment must establish that **"(1) the defendant wrongfully concealed material facts relating to the defendant's wrongdoing; [and] (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period."** Civil RICO claims are subject to a four-year statute of limitations that begins to run "when the plaintiff discovers or should have discovered the RICO injury**."** See *Merrill Lynch Ltd. Partnerships Litig.*, 154 F. 3d 56, 58 (2d Cir. 1998). *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F. 3d 23, 36 (2d Cir. 2002) states,

Misrepresentation of Applicable Laws in Pleadings that Result in a Clear Abuse of Discretion Twice (2) by the Same Enterprise, is Racketeering:

Abuse of Discretion:

A finding is `clearly erroneous' when although there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 394 -395. A district court **"abuses" or "exceeds" the discretion** accorded to it **when (1)** its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or **(2)** its decision — though not necessarily the product of a legal error, or a clearly erroneous factual finding — cannot be located within the range of permissible decisions. *United States v. United States Gypsum Co.*, 333 U.S. 364, 394 -395.

Discretion is said to be **"abused"** ("exceeded" would be both a more felicitous and correct term) **when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts**. This determination that **the range of acceptable decision-making has been exceeded in a particular case is assuredly one of law**, but it is analytically distinct from a determination that a legal

**standard applicable to a generality of fact situations has been
ignored**, incorrectly applied, or inadequately applied in a
particular case. *Zervos v. Verizon New York, Inc.*, 252 F. 3d
163, 168 (2d Cir. 2001) (quoting *United States v. United States
Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746
(1948)).

**A RICO plaintiff facing a statute of limitations problem should
consider arguing that the limitations period should be equitably
tolled until it could determine, exercising reasonable
diligence, that its injury stems from conduct that was part of a
pattern of racketeering**. See, e.g., *McCool v. Strata Oil Co.*,
972 F. 2d 1452, 1465 (7th Cir. 1992) **(noting that equitable
tolling may delay the running of the statute of limitations
"while a victim diligently investigates the possible existence
and extent of a pattern of racketeering")**.

Most courts use the phrases **"affirmative acts"** or **"active
misleading" to require the plaintiff to show that the defendant
took affirmative steps to conceal the claim through fraud.** See,
e.g., *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F. 3d
226, 237-38 (3d Cir. 2001); *Detrick v. Panalpina, Inc.*, 108 F.
3d 529, 542-43 (4th Cir. 1991); *Barry Aviation Inc. v. Land
O'Lakes Mun. Airport Comm'n,* 377 F. 3d 682, 689 (7th Cir. 2004);
*Pincay v. Andrews*, 238 F. 3d 1106, 1110 (9th Cir. 2001) and

*Grimmett v. Brown*, 75 F. 3d 506, 514 (9th Cir. 1996) **(alternating use of "actively misled" with "affirmative conduct" in describing elements of fraudulent concealment).**

The Plaintiff was, and still is, being defrauded by Florida's state judicial enterprise in his property and business interests in 1) appellate case 2D19-1384 (affirmed on 12-27-19) from trial case 17-CA-4051 and 2) in appellate cases 18-CA-1537 from trial case 17-CA-403 and in 3) case 17-CA-6219.

**42.   The Masterminds behind the RICO Predicate Acts in this Matter:**

It was on 3-8-16, during case 14-CA-12257, that the Plaintiff started adding up the pieces of the shim sham puzzle of what really went wrong to have ended case 12-CP-1669 in favor of opposing parties, when Lee Pearlman who had a Doctor of Jurisprudence Degree (J.D.) and supposedly graduated law school with honors, should have known better than not to have filed a rebuttal pleading twice (2) with an affidavit for the Plaintiff in refuting the allegations in the summary judgment motion filed in case 12-CP-1669, on 3-20-13. **And if Lee Pearlman did not believe that the Plaintiff was entitled to his share of the decedent's property, then he should not have taken the case or withdrawn as the Plaintiff's counselor.** The Plaintiff filed "Amended Complaint 04-15-17" on Lee Pearlman in case 14-CA-12257

on about 04-15-17, and then filed a similar complaint on Thomas Rydberg and his three accomplices from probate case 12-CP-1669 around 04-15-17, case 17-CA-4051.

During the months spent writing "Amended Complaint 4-15-17" (case 14-CA-12257) and thinking about how all of the Plaintiff's judges were **so way off base** in their rulings that **someone more powerful than a circuit court trial judge,** working from outside the 13th Judicial Circuit had to have been calling the **shots** in defrauding the Plaintiff, **but who had enough authority over the 13th Judicial Circuit's chief judge's office and enough hatred for the Plaintiff to have done so?**

**The Plaintiff then remembered the incident during his guardian advocate court proceeding, case 12-CP-249, having to do with his mentally compromised friend, Ms. Kimball, back in 2/2012.** In 2/2012, **HCSO had snapped it fingers and got an emergency hearing with Claudia Isom, probate and guardianship judge, to have the Plaintiff's guardianship illegally revoked and she obeyed.** In 2/2012, HCSO ignored the Plaintiff's letters of guardianship and continued to injure Ms. Kimball by giving her bad medications until her face was scared while she was in their custody. And when the Plaintiff complained to the detention commander, Colonel James Previtera at HCSO, he had two (2) of his HCSO goons at the Plaintiff's house with their guns drawn looking for a reason to **shoot him!** Tampa Police Department (TPD) and

Florida Department of Law enforcement (FDLE) had to be called into the matter by the Plaintiff in order for the death threats and harassment to stop, but in the end, Claudia isom illegally revoked the Plaintiffs letters of guardianship.

**What happened here is <u>absolute confirmation</u> of the power given to HCSO by the governor's office to damage the public <u>at will</u> and the <u>very</u> special relationship that <u>HCSO</u> has with its courthouse judges that it protects and <u>controls</u> for profit and gain (something of value)! Even with the Plaintiff's many complaints to Chief Judge Manuel Menendez's office through his secretary Kimberly Cash around 3-1-12, nothing was done about the illegal activities involving Claudia Isom and HCSO at the 13th Judicial Circuit during case 12-CP-249, on 3-1-12.** After the Plaintiff remembered having gotten nowhere with Manuel Menendez and Kimberly Cash, he also figured out before 4/2017 that the denial of his state and federal substantive due process rights in case 14-CA-10278 by accomplice Bernard Silver on 2-6-15, and in case 14-CA-12257 by both accomplice William levens and Mark Wolfe having defrauded the Plaintiff respectively on 4-6-16 and 5-18-16, were from Ronald Ficarrotta instructing them to do so as the chief judge of the 13th Judicial Circuit, from 2015 to present. **HCSO did not want to conduct an investigation into the decedent's murder for the Plaintiff having fingered James Previtera's illegal operational procedures at HCSO in**

**2/2012 with FDLE, so Sheriff David Gee had the chief judge's office instruct the trial judges to dismiss the Plaintiff's court cases slowly and illegally, monetarily injuring him.**

David Gee had blacklisted the Plaintiff at both HCSO and at the 13th Judicial circuit for having gotten Colonel James Previtera immediately reassigned and then terminated through FDLE beginning in 3/2012. Around 4/2017, there were way too many judges clearly defrauding the Plaintiff without there being a common purpose and a single source of instructions for so many of them in the local circuit to have made so many blatantly false rulings without fear of being made to see a psychiatrist and then terminated.

The only people who had **full control** over all of the judges in the circuit for racketeering purposes were Manuel Menendez and Ronald Ficarrotta. **These two crooks had been calling the shots as the ringleaders in a corrupt enterprise of racketeers, indorsed and approved by the acting chief judge of the Florida Supreme Court, Rick Scott and Pamela Bondi, all out to deprive the Plaintiff of his state and federal substantive due process rights for an all too obvious and childish reason, which was to help HCSO get even with the Plaintiff for mere satisfaction purposes (something of value).**

The term racketeers used in this complaint is not to be confused with musketeers, mouseketeers or rocketeers. These are the good

guys.  The Plaintiff finally figured out on 3-8-15 that Sybil
Murphy, with her attorneys Thomas Rydberg and Robert Welker from
probate case 12-CP-1669, including the Plaintiff's attorney Lee
Pearlman, were by beyond reasonable doubt evidence, **all part of
the same primary enterprise**.  Unknown to the Plaintiff until 5-
18-16, Robert Foster was informed of the RICO plan to defraud
the Plaintiff by Manuel Menendez (secondary enterprise) in court
case 12-CP-1669.  Robert Foster knew he had illegally helped
cover-up the decedent's murder when he ended the probate case
**with prejudice** after turning a blind eye to the extrinsic fraud
that was committed on the Plaintiff by the primary enterprise
before discovery into the decedent's murder had really started,
**so he would not be obligated to look at the evidence and order
an investigation into her murder.**  Opposing parties and their
attorneys winning case 12-CP-1669 was accomplished **not** by way of
negligence as first thought by the Plaintiff, but by way of an
extrinsic fraud in which the Florida Slayer Statute (732.802)
count was dismissed in the final order without the Plaintiff
knowledge or consent.  **The Plaintiff never gave written
permission to the clerk of the court, dismissing the slayer
statute count in case 12-CP-1669 and neither did his attorney
Lee Pearlman!  And Robert Foster had no legal authority to have
ordered the Plaintiff's murder count dismissed, unless opposing
parties had filed an affidavit to this effect and a hearing**

discussing at least one (1) good reason for dismissing the murder count resulted in a ruling by Robert Foster to do so!  So Robert Foster also wanted case 12-CP-1669 illegally dismissed, but as a member of the secondary enterprise. Robert Foster let the primary enterprise defraud the Plaintiff using his attorney because he did not have a fiduciary duty to the Plaintiff to intervene.

Leading up to 4/2017, in case 14-CA-12257, both accomplices William Levens and Mark Wolfe helped illegally limit what evidence the Plaintiff could subpoena.  With William Levens, it was **stopping the Plaintiff from obtaining both medical and banking records on the decedent to prove she was not taken to a doctor while she was being killed and her estate devalued by $1,058,800.  The Plaintiff also filed a motion in case 14-CA-12257 to compel Robert Welker to divulge his case file records in order to prove that his retainer contract with the decedent was forged by Cyrie Schneider.**  A hearing on this motion was never given by William Levens, who also refused to order Defendant Lee Pearlman to provide the Plaintiff with his complete case file records.  **This allowed Lee Pearlman to hold out on providing the Plaintiff with a copy of the $160,000 bank account, given to him by Thomas Rydberg, as proof of the decedent's devalued inventory and stolen assets.**

With Mark Wolfe, it was the decedent's banking records. **Mark Wolfe issued an order disallowing the decedent's banks to provide the Plaintiff with any of her banking records that went back any further than one (1) year from her death, when the Plaintiff was next of kin to the decedent and needed at least 20 years worth of the decedent's banking information to begin trying to find out where her missing $350,000 went.** <u>**Fraud**</u>! In committing these violations, accomplices William Levens, Mark Wolfe, Lee Pearlman with Florida Lawyers Mutual Insurance Company (FLMIC) and Thomas Rydberg continued to violate both the Plaintiff's and decedent's state and federal substantive due process rights in the <u>**tradition of excellence**</u> first committed on the Plaintiff by Bernard Silver and Claudia Isom, respectively tortious interference case 14-CA-10278 and guardianship case 12-CP-249. **Mark Wolfe, William Levens, Thomas Rydberg (with possibly CNA, if he was still working for them), Lee Pearlman and FLMIC, up to this point, committed spoliation of the decedent's banking record evidence.**

The Plaintiff figured out around 4/2017 that there was a bonafide conspiracy to defraud the Plaintiff by every elected official, colleague, attorney, affiliate and insurance company that came out of the woodwork to help Florida's state judicial enterprise (secondary enterprise) ruin all of the Plaintiff's cases, until there were no more legal actions left for him to

take in acquiring the stolen property owed to him, **but during this time, he could not figure out who initially wanted him monetarily injured and for what reason.**

**43.   Hindsight is always 20/20 to the Diligent:**

In the beginning of 2018, the Plaintiff received confirmation as to why HCSO had refused to do an investigation into the murder of the decedent, notably starting in mid. 2015 when the Plaintiff first thought to put some pressure on HCSO to finally investigate the decedent's murder by complaining to all of the state agencies affiliated with HCSO.

During a telephone conversation with ABC, Inc. (Disney) reporter Adam Waiser around 1/2018, he stated that an investigation into why HCSO had refused to investigate the decedent's murder was conducted by another ABC, Inc. news reporter working at HCSO (crookedly suspicious), in which HCSO had solicited the 13th Judicial Circuit (offices of both Manuel Menendez and Ronald Ficarrotta) to circumvent any judicial inquiry going to HCSO to investigate the decedent's murder and to keep the Plaintiff from deposing any HCSO officer!  Adam Waiser also stated that there was a special relationship between HCSO and the 13th Judicial Circuit, so anything illegal that HCSO wanted covered up in the courthouse, would be implemented. **Adam Waiser stated that Ronald Ficarrotta was 1) not about to let a pro se litigant**

**prove a conspiracy against Sheriff David Gee, especially if he had been in bed with him.  And consequently, Ronald Ficarrotta was also 2) not going to allow any of his judges to allow Chad Chronister or any other HCSO employee to be deposed by the Plaintiff, so no one at HCSO could implicate either David Gee or himself (Ronald Ficarrotta) as an accessory after the fact in the murder of the decedent!**

By beyond reasonable doubt evidence, HCSO had asked Ronald Ficarrotta in early 2018, to have Richard Nielsen in case 14-CA-12257, along with Paul Huey, Elizabeth Rice, Catherine Catlin and the other judges from the local courthouse who were hearing the Plaintiff's court cases during 2018, illegally dismissed either the Plaintiff's motions or cases by ruling against him at every hearing.  Even cases that had nothing to do with the decedent's murder, like cases 17-CC-403 (Joelle Ober) and 17-CA-6219 (Elizabeth Rice), were being illegally dismissed.  The Plaintiff could no longer take Sheriff Chad Chronister's deposition, or any other HCSO deputy's deposition, after HCSO contacted the 13th Judicial Circuit right before 1-24-18, during case 14-CA-12257, and before 4-8-18, during case 17-CA-4051.  And HCSO indirectly had the 2DCA Chief Judge Edward LaRose, through the offices of Jorge Labarga, Florida Supreme Court Chief Judge and the chief judge at the 13th Judicial Circuit, Ronald Ficarrotta, illegally PCA the Plaintiff's 2DCA appealed

cases filed in 2017 and 2018, which were: Cases 2D17-2243, 2D17-2725, 2D18-694, 2D18-1889, 18-CA-1537, 2D18-4761 and 2D18-1538.

**Adam Waiser did not say why HCSO did not want to investigate the decedent's murder, but the Plaintiff knew why. FDLE had embarrassed Sheriff David Gee when he was given a firm recommendation to terminate Colonel James Previtera from HCSO. And after David Gee had retired from HCSO in 9/2017, his friend Chad Chronister was just continuing to get even with the Plaintiff.**

In early 2012, both Claudia Isom and Paul Huey the presiding judge after the Plaintiff recused Claudia Isom, on 4-25-12, from case 12-CP-249, assisted HCSO in permanently revoking the Plaintiff's letters of guardianship in case 12-CP-249. When the decedent was murdered in 7/2012, Claudia Isom was the probate judge who was first informed of the decedent's murder by way of the Plaintiff recusing her from case 12-CP-1669 on 8-6-12. Claudia Isom in turn told her contacts within the chief judge's office of the money owed to the Plaintiff by way of Florida slayer statute 732.802.

**HCSO asked the courthouse sometime after 2/2012, through the chief judge's office, to damage the Plaintiff's cases at both the 13th Judicial Circuit and the 2DCA, depriving him of money**

owed, just like the Plaintiff had deprived Colonel James Previtera of money earned.

"An eye for an eye, and a tooth for a tooth", along with "What goes around, will come back around" were stated to the Plaintiff by one of the two HCSO goons, who in 2/2012, was looking to shoot him at his address.  The same two HCSO gang members who wanted to shoot the Plaintiff in 2/2012, went out to meet him in the courthouse caught on camera during case 10-CF-012263-A, on 4-5-12, when they knew he would be there, just to let him know that HCSO was going to get even with him. At this point in time, the Plaintiff did not know James Previtera had been removed from his detention position and was eventually going to be terminated from his employment at HCSO, or when his friends there were going to injure him, but he knew they would, if given the opportunity. The Plaintiff recused Claudia Isom as the presiding judge on case 12-CP-1669, but since the cat was out of the bag on the Plaintiff being entitled to **slayer statute amounts of money in his petition**, by beyond reasonable doubt evidence, David Gee had the 13th Judicial Circuit through Manuel Menendez, told Robert Foster to illegally dismiss case 12-CP-1669, **but he did not have to, Lee Pearlman and Thomas Rydberg from the primary enterprise had already** beaten him to the punch! All of the judicial accomplices have been part of the same childish and illegal snitch niche against the Plaintiff since

2012, when Colonel James Previtera was unwillingly asked by Sheriff David Gee to find other employment. **The last time the Plaintiff talked with Adam Waiser, he stated that he would lose his job and career, if he pushed any further for the decedent's story to air and then disconnected the telephone call.** Consequently, around the beginning of 2018 the Plaintiff knew why the endless pattern of RICO predicate acts had been committed and would be continuing forever, compliments of the governor's office!  <u>If State of Florida employees David Gee and Manuel Menendez, had been committing obvious illegal acts, they were absolutely approved by the governor and seconded by the flunky attorney general</u>!  The Plaintiff confirmed this to be true when he sent Rick Scott and Pamela Bondi all the proof they needed by USPS certified mail, and they turned a blind eye to their fiduciary duty to act appropriately.  Respectively on 11-19-18 (USPS 70182290000075887042) and 8-9-18 (USPS 70173380000052003137).

Under the traditional federal accrual principle, a statute of limitation period does not begin to run until the cause of action is **complete**, when the final fraudulent act monetarily injuring the plaintiff has been committed **(when the victim in a court case either stops litigating the claims, or has reached the end of their legal remedies)**.  See, e.g., *Rawlings v. Ray*, 312 U.S. 96, 98 (1941); *Clark v. Iowa City*, 87 U.S. 583, 589

(1874).  *Isaak v. Trumbull Sav. & Loan Co.*, 169 F. 3d 390, 396-97 (6th Cir. 1999) **(concluding that plaintiffs had standing to bring RICO action when camping resorts filed for bankruptcy, because "bust-out" scheme to defraud buyers was complete by the final fraudulent act of placing the property into bankruptcy)**.

**And in any case, fraudulent concealment tolls the statute of limitations in a RICO cases.  Under Rule 9(b), the Plaintiff was defrauded right out of case 12-CP-1669 by the accomplices committing an extrinsic fraud on him, found out on 3-8-16 and documented around 4-15-17, cases 14-CA-12257 and 17-CA-4051. And then again the Plaintiff was defrauded out of reopening case 12-CP-1669 with new evidence on 5-16-16 and again on 5-4-17 by both the local courthouse probate judges respectively Robert Bauman and Catherine Catlin.  And in 2DCA case 2D17-2725, by the three judge panel having affirmed Catherine Catlin's order on 6-8-18 not to reopen case 12-CP-1669, complements of Edward LaRose (Title 18, Chapter 96, Sections 1962(b & c)), Marva Crenshaw and Susan Rothstein-Youakim.**

**Plaintiffs have been allowed to bring RICO actions for acts of <u>public corruption</u> that resulted in pecuniary (monetary) injury to them.**  *Envtl. Tectonics v. W. S. Kirkpatrick, Inc.*, 847 F. 2d 1052, 1067 (3d Cir. 1988); **(business competitor had standing to challenge defendant's <u>alleged use of bribery</u> of foreign government officials to obtain contracts)**, judgment aff'd, 493

U.S. 400 (1990); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F. 2d 1263, 1268 (3d Cir. 1987) **(land developer allowed to bring RICO action for injuries sustained from defendants' <u>bribery of town officials</u>)** and *Bieter Co. v. Blomquist*, 987 F. 2d 1319, 1327 (8th Cir. 1993) **(permitting builder to pursue RICO claim <u>where alleged bribery of public officials</u> raised issue of fact concerning proximate cause of builder's injury from failure to obtain rezoning)**.

Together, all of the Defendants and their accomplices were part of the scheme to deprive the Plaintiffs from obtaining money owed to them, damaging them in their property and business interests, by illegally denying them and the decedent their state and federal substantive due process rights. **<u>The court rejected the notion that business or property interests harmed by a defendant's acts must actually be the target of the predicate act, and remanded the case to determine if the plaintiff could satisfy the remaining aspects of his claim</u>.** *Diaz v. Gates*, 420 F. 3d 897 (9th Cir. 2005), Id. at 900-03. **A RICO action may be maintained even if the "injury to business or property" is not the predominant injury alleged.** *Northeast Women's Ctr., Inc. v. McMonagle,* 868 F. 2d 1342 (3d Cir. 1989), Id. at 1349.

Hindsight being 20/20, James Previtera and David Gee, acted respectively through Claudia Isom and Manuel Menendez in 2012 as

co-conspirators under Title 18, Chapter 96, Section 1962(d) to all of the counts stated in Sections 1 and 4. And by beyond reasonable doubt evidence, David Gee had instructed the secondary enterprise (state judicial enterprise) to defraud the Plaintiff and decedent in violation of Title 18, Chapter 96, Section 1962(d) after 2/2012.

On 10-9-18, Chet Tharpe came up with a uniquely clever fraud tactic not used before by Florida's state judicial enterprise when he tried to extort money out of the indigent Plaintiff in case 18-CA-1537 by demanding that he start paying off a $108.50 transcript fee for a copy of the lower court's case record, **or he would not hear the case. Dereliction of duty and extortion!** The Plaintiff received permission by the courthouse under Florida Statutes 57.081(1) to be exempt from any upfront appellate fee when it indexed (transcribed) the lower case file (17-CC-403) as part of the appellate process. Case 18-CA-1537, from case 17-**CC**-403, was the plaintiff's product liability appeal, which had nothing to do with the decedent's murder, but was illegally stopped by Chet Tharpe to continue the pattern of RICO predicate acts, in the **tradition of excellence**, committed under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346 (honest services fraud) by the Florida's state judicial enterprise, to monetarily damaging the Plaintiff in his business interest into 2020.

The new angle that Florida's state judicial enterprise is currently using to defraud the Plaintiffs with in their court cases, has courthouse confederates (judges and lawyers) make up a reason having nothing to do **specifically with the actual merits of the cases in order to illegally stop the court cases from progressing.** This is what happened in case 17-CA-4051, where Elizabeth Rice dragged this case out 1.5 years and then illegally dismissed it on 3-19-19 **for the Plaintiff not rewriting the complaint the way she wanted it rewritten.** <u>**Twistedly demonic**</u>! And Elizabeth Rice implemented the same method of injuring both Plaintiffs in case 17-CA-6219 until she was removed from the division by the state judicial enterprise around 12-19-19 for being too obvious in her defrauding tactics.

**44. Economic Motive:**

In *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994), the Supreme Court resolved an ongoing dispute among the federal courts of appeals by holding that neither a RICO enterprise nor the predicate acts of racketeering must have an economic motivation. Prior to the Supreme Court's decision, three circuits, including the Seventh Circuit in *Scheidler v. National Organization for Women, Inc.*, had concluded that the RICO enterprise (or at least the predicate acts) must have an economic motive. In a unanimous decision, the Supreme Court

reversed the Seventh Circuit and held that **no proof of economic motive is required**.  The Court concluded that the plain language of § 1962(c) and the definition of "pattern of racketeering activity" in § 1961(1) provide **no indication that an economic motive is required**.  The Court rejected the Seventh Circuit's conclusion that because the use of the term "enterprise" in § 1962(a) and (b) is tied to economic motivation, the same term should be applied to restrict the breadth of § 1962(c).  The Court reasoned that because the "enterprise" in § 1962(c) is not being acquired and instead is the vehicle for the commission of the racketeering activity, "it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; **it need only be an association in fact that engages in a pattern of racketeering activity**."

**45.  18 U.S. Code § 1964 - Civil Remedies:**

**(a)**  The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter **by issuing appropriate orders, including, but not limited to:**  <u>ordering any person to divest himself of any interest, direct or indirect, in any enterprise</u>;  imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the

enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, **making due provision for the rights of innocent persons.**

**(b)** The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time **enter such restraining orders or prohibitions**, or take such other actions, including the acceptance of satisfactory performance bonds, **as it shall deem proper.**

**(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees,** except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

**(d)** A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the

essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.   (Added Pub. L. 91-452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 943; amended Pub. L. 98-620, title IV, §402(24)(A), Nov. 8, 1984, 98 Stat. 3359; Pub. L. 104-67, title I, §107, Dec. 22, 1995, 109 Stat. 758.)

**46.**   RICO requires "a person" who violated or conspired to violate under § **1962(a) to be the principle** of the company or enterprise, and to violate under § **1962(b) to manage the company** or enterprise and to violate under § **1962(c) to be an associate or affiliate** of the company or enterprise.

**47.**   The Senate Report regarding Section 1959 states that any person who **aids and abets a violation** of the listed underlying **crimes of violence is also liable for a Section 1959 violation "under 18 U.S.C. § 2" (the acts of the perpetrator become the acts of the aider and abettor) in addition to "the person who actually commits or attempts the offense."** S. Rep. No. 98-225 at 307.   Thus, Congress manifested its intent that federal law of aiding and abetting applies to Section 1959.   In accordance with this legislative history, all of the courts that have decided the issue have held that **a person may be liable for a Section 1959 violation on the ground of aiding or abetting**.

Therefore, a defendant may be liable under Section 1959 for the commission of a **crime of violence** for having **aided and abetted another person's efforts to gain entrance to, or maintain or increase that person's position in an enterprise, even though the defendant does not seek to gain entrance to, or maintain or increase his own position in, an enterprise (§ 1962(c))**. See, e.g., *Frampton*, 382 F. 3d at 222-23. This principle not only flows from the law on aiding and abetting, but also **stems** from the well settled principal that **a defendant may be liable for a conspiracy to violate (§ 1962(d)) a law even if he may not be liable for a substantive violation of the law because he does not fall within the category of persons who could commit the substantive offense directly.** See, e.g., *Salinas v. United States*, 522 U.S. 52, 64 (1977) ("[A] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense.") (citing *United States v. Rabinovich*, 238 U.S. 78, 86 (1915)). See, e.g., *Frampton*, 382 F. 3d at 222-23 (applying 18 U.S.C. § 2); *Khalil*, 279 F. 3d at 109 367-370; (same); Diaz, 176 F. 3d at 96-97; *Houlihan*, 92 F. 3d at 1293; *Matta-Ballesteros*, 71 F. 3d at 765 n. 8, 771; *Hoyte*, 51 F. 3d at 1245; *Locascio*, 6 F. 3d at 941; *Concepcion*, 983 F. 2d at 383-84 (applying 18 U.S.C. § 2) and Cf., *Marino*, 277 F. 3d at 29-32 (suggesting, but not holding, that state law applies).

48.    "To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." *Khalil*, 279 F. 3d at 369, quoting *United States v. Martin*, 920 F. 2d 345, 348 (6 Cir. 1990). See also *Concepcion*, 983 F. 2d at 383 ("To secure a conviction on a theory of aiding and abetting in violation of [18 U.S. Code § 2(a)), **the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required the defendant to act, with the specific purpose of bringing about the underlying crime** . . . . Under 18 U.S. Code § 2(a), **an aider and abettor must share in the principal's essential criminal intent**, [and] the principal must be shown to have **had the essential** criminal **intent**.") (internal quotations and citations omitted).  This requirement that the defendant **must share** the same criminal **intent** as the principal is especially significant as it applies to aiding and abetting a Section 1959 violation **because "[t]he intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal. Rather, the defendant must act with the specific intent of facilitating or advancing** the principal's commission of the

**underlying crime**." *Frampton*, 382 F. 3d at 223.   **The defendant knew that the principal he was aiding and abetting was seeking to gain entrance to, or maintain or increase his position in, the enterprise and "acted toward that end**." *Frampton*, 382 F. 3d at 223.112.

**49.** *Pinkerton* **Liability Doctrine:**

Under the Pinkerton Liability Doctrine, **a defendant is a principal when he consciously shares in any criminal act, whether or not there is a conspiracy**.  In *Pinkerton v. United States, 328 U.S.* 640 (1946), defendant Daniel Pinkerton and his brother were charged with conspiracy to violate the tax laws and with two substantive tax violations.  Although no evidence was introduced showing that Daniel Pinkerton participated directly in the commission of the substantive offenses, the district court instructed the jury that each defendant could be found guilty of the **other's** substantive offenses, if they were **both part of the same criminal conspiracy** and "the acts referred to in the substantive counts **were acts in furtherance** of the unlawful **conspiracy or object** of the unlawful conspiracy." Id. at 645 and n. 6.  **The Supreme Court upheld Daniel Pinkerton's conviction under a theory of co-conspirator liability, but cautioned that the case would be different "if the substantive offense committed by one of the conspirators was not in fact**

done in <u>furtherance of the conspiracy</u>, **did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be <u>reasonably foreseen as a necessary or natural <u>consequence of the unlawful agreement</u>.</u>" Id. at 647-648.** The instruction upheld in Pinkerton did not explicitly state that a defendant is liable under the Pinkerton doctrine for the substantive acts of his co-conspirators, only if those acts were **"reasonably foreseeable."** Some circuits, however, have indicated that a Pinkerton instruction must explicitly include "reasonable foreseeability" language even though that language did not, in fact, appear in the jury instruction in Pinkerton itself. **In any event, the common and better practice is to include such 113 "reasonable foreseeability" language in a Pinkerton instruction.** Moreover, the government may not rely on the Pinkerton doctrine unless the jury is "instructed in terms of that theory." *Pereira v. United States*, 347 U.S. 1, fn. at 10 (1954) and *Accord Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949). **Applying these principles, courts have held in Section 1959 prosecutions, that a defendant may be convicted of an underlying crime of violence (murder) in violation of state law under the federal Pinkerton doctrine. <u>All of the Defendants cited in Section 7 are guilty of having violated Section § 1959</u>.** See, e.g., *Diaz*, 176 F. 3d at 99-100; *Tse*, 135 F. 3d at 206-07; *United States v. Katona*,

204 F. Supp. 2d 410, 412 (E.D.N.Y. 2002) and Cf., *United States v. Carrozza*, 55 F. Supp. 2d 84, 87-89 (D. Mass. 1999).

## 49.5  Respondeat Superior Doctrine:

Respondeat superior (Latin: **"let the master answer"** is a doctrine that a party is responsible for (has vicarious liability for) the acts of their agents.  Criminal Law - Cases and Materials, 7th ed. 2012, Wolters Kluwer Law & Business; John Kaplan, Robert Weisberg, Guyora Binder, ISBN 978-1-4548-0698-1. For Example, in the United States, there are circumstances when an **employer is liable for the acts of employees performed within the course of their employment.**  Harger, Lloyd.  "Workers' Compensation, A Brief History".  Florida Department of Financial Services.  Retrieved 22 June 2010.  This rule is also called the master-servant rule, recognized in both common law and civil law jurisdictions.  Owen, Ralph Dornfeld.  "Tort Liability in German School Law".  Law and Contemporary Problems.  Duke University School of Law.  20 (1):  72-79. JSTOR 1190275.

**Respondeat superior is a legal doctrine, most commonly used in tort, that holds an employer or principal (company, owner or even a supervisor) legally responsible for the wrongful acts of an employee or agent, if such acts occur within the scope of their employment or agency.**  Typically when respondeat superior

is invoked, a plaintiff will look to hold both the employer and the employee liable.  As such, a court will generally look to the **doctrine of joint and several liability** when assigning damages.

**Joint and Several Liability:**

Joint and several liability is a rule followed in **all federal courts** (Federal Rule 19) and some states, in which two or more parties can be held **independently liable** for the full amount of a personal injury plaintiff's damages, **regardless of their respective degrees of fault (federal Rule 19).**  The parties that are found responsible for the accident are known as tortfeasors. Under the joint and several liability rule, a single tortfeasor can be held responsible for the total amount of damages **even if he or she is only responsible for the plaintiff's injuries to a small degree.**  If the plaintiff collects from only one jointly and severally liable defendant, that defendant can pursue the other responsible parties for contribution.  Usually, the defendants' liability for damages is reduced to the extent that the plaintiff was negligent.  Not all states follow the rule of joint and several liability, and many follow a hybrid rule.


**50. Accessory after the Fact under Title 18, U.S. Code 3:**
**Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the**

offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact. Courts have held that under this provision, **a defendant may be convicted as an accessory after the fact to a violation of Section § 1959**, provided the government proves: **(1) the commission of an underlying offense against the United States [i.e., § 1959] by [another person], (2) the defendant's knowledge of that offense, and (3) assistance by the defendant, in order to prevent the apprehension, trial, or punishment of the offender (Title 18, U.S. Code § 3)**. *Cuong Gia Le*, 310 F. Supp. 2d at 779. *Accord United States v. Malpeso*, 115 F. 3d 155, 163-64 (2d Cir, 1997).

51. RICO **"is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity**." *Crest Constr. II, Inc. v. Doe*, 660 F. 3d 346, 353 (8th Cir. 2011) (quoting *Gamboa v. Velez*, 457 F. 3d 703, 705 (7th Cir. 2006)). A properly stated RICO claim in the Eighth Circuit must allege the following four elements: **"(1)** conduct **(2)** of an enterprise **(3)** through a pattern **(4)** of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

52. Conduct:

The first element of RICO is conduct. This element is extremely straightforward and rarely litigated in court. It simply

requires the defendants who **participated** in the enterprise to **carry out the directions of the enterprise.**

53. **Enterprise:**

An 'enterprise' is defined in 18 U.S.C Section 1961 (4) to include "any individual, partnership, **corporation, association,** or other **legal entity,** and **any union or group of individuals associated in fact although not a legal entity**". The Eighth Circuit requires **"an ascertainable structure distinct from the conduct of a pattern of racketeering."** *Crest Constr. II, Inc.*, 660 F. 3d at 354 (quoting *United States v. Lee*, 374 F. 3d 637, 647 (8th Cir. 2004)). Further, **"an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts."** Id. (quoting *United States v. Bledsoe*, 674 F. 2d 647, 664 (8th Cir.), cert. denied, 459 U.S. 1040 (1982)). **An enterprise must still exist without the illegal conduct.** This does not mean that simply the members must exist, but rather **the enterprise itself exists and maintains structure.** In *United States v. Bledsoe*, the Eighth Circuit held that an association-in-fact enterprise must exhibit three characteristics: (1) **a common or shared purpose among its members;** (2) **some continuity of structure** and personnel; and (3) **an ascertainable structure distinct from that inherent in the pattern of racketeering.**

**54.  Pattern:**

A 'pattern of racketeering activity' requires at least two acts of racketeering activity. **18 U.S.C. § 1961(5)**. However, the Eighth Circuit has held that **multiple acts of racketeering may not be enough**. See *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989). **The acts must "amount to or pose a threat of continued criminal activity.**" *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989). This continuity requirement can be established by showing either closed-ended or **open-ended continuity (the continual defrauding of the Plaintiff in his cases forever more by the Florida's state judicial enterprise)**. At minimum, the predicate acts for close-ended continuity must span a period of "at least one year." **Open-ended continuity**, however, does not require that the acts span for a certain period of time. Rather, the racketeering acts must **"include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business.**" See *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 242 (1989).

**55.  Racketeering Activity:**

The element of 'racketeering activity' is extremely broad. The statute includes **murder,** kidnapping, gambling, arson, robbery,

**bribery**, **extortion**, or a list of many other criminal statutes. The more common statutes include **fraud**, obstruction of law enforcement, forgery, and trafficking statutes. It is impossible to have a racketeering claim without finding the defendant guilty of another criminal violation. Heightened civil and criminal penalties of RICO are reserved for **schemes whose scope and persistence** **set them above the routine**.

56.  **Association-in-Fact Enterprise:**

**Any group of entities or individuals that is "associated in fact" may be a RICO enterprise.** Historically, many courts required the association-in-fact enterprise to have some structure or hierarchy and an ongoing legitimate purpose that was different from a group that is joined solely to violate RICO. In *United States v. Bledsoe*, the Eighth Circuit held that **an association-in-fact enterprise must exhibit three characteristics:** **(1)** a common or shared purpose among its members; **(2)** some continuity of structure and personnel; and **(3)** an ascertainable structure distinct from that inherent in the pattern of racketeering.

57.  **Evidentiary Facts and Actionable Claims in Support of the Counts with Evidence in Appendices:**

**A Brief Introduction:**

What the co-conspirators in the primary and secondary enterprises, along with the CNA Insurance Company did not foresee when they respectively defrauded the Plaintiff on 5-15-13, 7-29-13 and 6-6-14, case 12-CP-1669 and on 2-6-15, case 14-CA-10278, was the **diligent and relentless Plaintiff** filing new complaints with different counts and claims that addressed both the same underlying inheritance money stolen from him and the decedent's murder cover-up that unfortunately for them, reiterated over and over again **what they illegally participated in! The more accomplices who were suckered into helping the existing crooked participants fight the Plaintiff in ending his new cases as 1) accessories to both honest services frauds and 2) covering up the prior racketeering activities committed by the state judicial enterprise and their co-conspirators or lose their standing as affiliates in multiple enterprises, the more RICO predicate acts that were committed by the ever growing number of enterprise members from each enterprise, who by participating in defrauding the Plaintiff, would in turn make themselves, their supervisors and their companies liable for the Plaintiff's damage amounts and undeniably prove the Plaintiff's racketeering counts and claims.** This allowed for over forty (40) RICO predicate acts to be committed and documented as the state judicial enterprise continued implementing their scheme to

231

defraud the Plaintiffs **using officers of the court**, while covering up their prior racketeering activities, again and again.

Ronald Ficarrotta had Joelle Ober ended case 17-CC-403 on 2-7-18, a case that had nothing to do with the decedent's murder, in order to both monetarily injure and tire the Plaintiff into giving up all of his legal causes for justice. **Florida's state judicial enterprise's scheme of defrauding the Plaintiff in <u>all</u> of his court cases resulted in multiple series of related RICO predicate acts committed with the same pattern and purpose of stopping the Plaintiff, along with his co-plaintiff, from together obtaining four (4) different money amounts.** These acts were judicial orders filed in violation of the Plaintiffs' and/or decedent's state and federal substantive due process rights (civil rights violations), committed under Title 18, Chapter 96, Section 1341, 1343 and 1346 which have been going on now for seven (7) years! Dozens of Civil RICO Act violations were committed using some of the following shim sham, scam rulings by judges when knew better: **1) Extrinsic fraud** was used to dismiss a very obvious murder count as a cause of action in a case 12-CP-1669. **2) Collateral Estoppel** from Florida statute 733.103(2), was used when it was not applicable to the actionable claims cited in the complaints, resulting in the dismissal of cases 14-CA-10278 and 16-CA-4693. **3) Res Judicata**

232

was used when it was not applicable to the actionable claims cited in the complaint, resulting in the dismissal of case 17-CC-403. **4)** Having to **divest a gifted deed instrument that was never legally delivered before contesting a separate will instrument** was used to dismiss cases 16-CA-4693 and 12-CA-12257. **5) Not having the right to sue your attorney for lack of privity with him** was used to dismiss case 16-CA-4693. **6) Illegally having the Plaintiff's complaints dismissed and rewritten twice in cases 17-CA-4051 and three times in case 17-CA-6219 and then dismissing case 17-CA-4051 with prejudice on 3-19-19 because the revised complaints were not written the way the court wanted. And 7) not paying a courthouse waved transcription fee, or the case would not be heard, was ordered on 10-9-19 and 11-27-18, case 18-CA-1537.**

**The evidentiary facts and relevant laws cited in all of the Plaintiff's complaints, clearly outlined the merits of each court case, substantiating both the counts and claims.**

The verdict is still out in case 17-CA-6219 in which Elizabeth Rice ordered the complaint to be rewritten on 8-22-18, 5-22-19 and 10-10-19 in violation of the Four Corners Rule, **stating on 5-22-19 that she did not see why Julie Holt, local public defender, one of the ringleaders and co-conspirators in case 17-CA-6219, was a defendant being sued**, and would be dismissing the

233

case with prejudice, if the complaint was not <u>correctly written</u> after giving the Plaintiff just <u>one more</u> chance to rewrite the complaint (leave to amend) the <u>way she wanted it rewritten</u>. Elizabeth Rice heavily implied that Julie Holt's name had to be taken out of the complaint when it was refiled on 6-11-19, case 17-CA-6219!   <u>This was once again, Florida's state judicial enterprise illegally flexing its muscles in the 13th Judicial Circuit, by using the best crooked judges they could find to illegally stop consumers from acquiring justice in Florida courts</u>!   A court reporter was present, if a transcript is needed.   And Elizabeth Rice also stated on 5-22-19 that she did not want the revised complaint to be <u>any longer with any more defendants listed after giving leave to amend</u>.   <u>Truly an unethical tyrant on a mission to tire and defraud</u>!

Several court of appeals and district courts have ruled that respondeat superior is appropriate under Section § 1962(c) when the party to be held vicariously liable is not the alleged enterprise (not the company, but a group of bad actors within a company or agency), and also was not the central figure or aggressor in the alleged scheme (not the facilitator or principle under Section 1962(c)).   See, e.g., *Davis v. Mutual Life Ins. Co. of New York*, 6 F. 3d 367, 378-80 (6th Cir. 1993); *Liquid Air Corp. v. Rogers*, 834 F. 2d 1297, 1306 (7th Cir. 1987); *Brady v. Dairy Fresh Products Co.*, 974 F. 2d 1149, 1154-

55 (9th Cir. 1992) and *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F. 3d 1386, 1406-1407 (11th Cir. 1994) **(holding that respondeat superior liability** may be assessed under Section § 1962(c) where corporate employers **(companies and/or owners) benefit from the acts of its employees and the acts were:** **(1)** related to, and committed within, the course of employment; **(2)** committed in furtherance of the corporations' business; and **(3)** authorized, or acquiesced in, by the corporations, opinion modified on other grounds on reh'g, 30 F. 3d 1347 (11th Cir. 1994). The *Bloch* court relied upon a footnote from *Petro-Tech* which stated that **"there could be circumstances in which the common law of respondeat superior would hold an employer (company) liable even when the employer did not benefit from the employee's conduct (where the employees are the owners of a company who were the only ones who benefited, not their company)."** *Bloch*, 707 F. Supp. at 193, quoting *Petro-Tech, Inc.*, 824 F. 2d at 1359 n. 11.


**Respondeat Superior Doctrine in conjunction with a RICO violation, would also hold a supervisor liable for triple remedial damages even if the supervisor did not benefit from the employee's conduct, as long as the subordinate employee was working within the scope of employment and 1) the supervisor was "guilty of negligence in the appointment of such sub-agent."**

(Hilton v. Oliver (1928) 204 Cal. 535, 539.).   And 2) the supervisor <u>knew what illegal acts had been performed by the sub-agent</u>, but instead of acting appropriately, turned a blind eye to the wrong committed.   The negligent hiring done by the supervisor goes beyond the scope of the agency relationship, and, as such, beyond the scope of any immunity that they would have as an agent of the employer.   With such immunity no longer applicable, plaintiff's counsel can establish a negligence claim showing a supervisor's knowledge of an <u>employee's propensity for committing the torts at issue</u>.

Below are both case and Defendant specific chronological listings of the frauds committed in violation of the Civil RICO Act by the Defendants and their accomplices when all' of them at least consciously shared in covering up the prior RICO predicate acts committed by the principles with new ones foreseeable continuing in the future, costing the Plaintiffs in their business and/or property interests, by depriving them of their 5th and 14th constitutional amendment rights in **every one** of their court cases listed in this complaint, except court case 17-CA-8903.

Keep in mind there is no **statute of limitations** on **1)** being an accessory after the fact in a murder, or on any state or federal judge having **2)** aided and abetted a fraud on the court to be

perpetrated on a party in a court case. **The Florida Governor's Office and former governor Rick Scott, were informed of most of the illegal acts committed in the paragraphs below by USPS certified mail, as were Pamela Bondi and the Florida Attorney General's Office, but these accomplices did nothing, but ignore the Plaintiff's request for help in fighting affiliate gang members in their Florida government cabal!** Consequently, anyone who holds a position where one of their require duties is to assist in the enforcement of federal statutes when probable cause has been established, either refuses to do so, or takes action to prevent the enforcement of the penalties, is considered an accessory after the fact under Title 18, U.S. Code § 3. And when future racketeering was foreseeably committed, is also in violation of Title 18, Chapter 96, Section 1962(c).

State municipalities can be sued in state court outside of RICO for one of their employees having breached state government policy either negligently or deliberately (punitive damages allowed) that caused damages during the scope of their employment, but this is not the case with Rick Scott and Pamela Bondi who acted outside the scope of their employment.

**Both Rick Scott and Pamela Bondi can be sued for every illegal act committed on the Plaintiffs and decedent under the RICO Act as individuals because they were informed of the wrong that was**

being committed when they had a fiduciary duty to their citizens as government employees (official capacities) to stop Florida's state judicial enterprise from continuing to defraud citizens seeking justice in Florida courts, but failed to act appropriately, choosing to turn a blind eye to foreseeable future racketeering as part of their <u>subjective policy</u> of treating all of their citizens <u>differently while protecting their affiliates!</u>

**58A.** In the decedent's will contest, case 12-CP-1669, both the illegal probating of false inheritance instruments by Robert Welker for where the decedent's property was going (in rem) and the litigation of a false summary judgment motion filed by Thomas Rydberg containing false affidavits from Sybil Murphy, Robert Welker and Cyrie Schneider, resulted in the decedent's caretakers fraudulently inheriting the decedent's entire million dollar estate. Together, all three (3) of these accomplices along with the Plaintiff's own attorney, Lee Pearlman, committed: **I** Fiduciary & Common Law Frauds; **II** Gross Negligence; **III** Concealment Fraud; **IV** Fraudulent Misrepresentation; **V** Extrinsic Fraud; **VI** Abuse and Neglect under Florida Statutes 415.1111 & 732.802 (Slayer Statute); **VII** Bad Faith Breach of Legal Representation Under Contract; **VIII**

Constructive Fraud and **IX** Aiding and Abetting During and After a Murder, respectively under Title 18, Chapter 1, Sections 2 & 3. Yet Robert Foster did nothing but dismissed the case with **prejudice.  Fraud!** Sybil Murphy and her three (3) lawyers, including Lee Pearlman, not only knew of the others' illegal acts beforehand (scienter under state and federal Rule 9(b)), but purposely aided each other in planning, commit and cover-up all of the frauds cited above as **accessories after the fact in the decedent's murder under Title 18, Chapter 1, Code § 3.** And all three (3) of these lawyers violated The **Florida Bar's Code of Conduct Rules from 4-3.3 to 4-8.4.** In Supreme Court of Florida, *The Florida Bar v. Whitney*, 132 So. 3d 1095, No. SC11-1135 (2013) **cites when an attorney is in violation of the Florida Bar's code of conduct.**

Lee Pearlman helped opposing parties illegally win in probate by deliberately failing twice (2) to file the Plaintiff's affidavit for refuting the false affidavits filed by opposing counsel Thomas Rydberg at least 48 hours before the summary judgment hearing (5-6-13), and rehearing (7-29-13). This resulted in the dismissal of case 12-CP-1669, but with the slayer statute count (Florida Statute 732.802) also having been dismissed with prejudice without the Plaintiff's knowledge or permission (extrinsic fraud). The slayer statute count was never argued during the summary judgment hearings by any party and no

affidavit by opposing parties was ever filed refuting the decedent's murder in violation of the Four Corners Rule.    If case 12-CP-1669 was not dismissed, Robert Foster would have been required to have ordered an investigation into the decedent's death and her murder corroborated.    Robert Foster read the complaint and knew of the Plaintiff's murder allegation count before illegally dismissing it **with prejudice** on 5-15-13 because of Lee Pearlman's failure to adequately work the case.    The transcripts from these two (2) hearings (5-6-13 and 7-29-13) are in the case file (12-CP-1669) only because the Petitioner alone hired a court reporter and filed copies with the clerk of the court.    The accomplices are:   **Ricky Polston, Rick Scott and Pamela Bondi as the principle leadership of the secondary enterprise (Section § 1962(b)), Claudia Isom, James Previtera, David Gee (Section § 1962(b)), Manuel Menendez (Section § 1962(b)), Lee Pearlman, Thomas Rydberg, Thomas Rydberg P.A., Robert Welker Sybil Murphy and Robert Foster,** for the above reasons.   See Appendix A documents.

**58B.**   On 6-6-14, the 2DCA in appellate case 2D13-4571, legally in part affirmed the final order in probate case 12-CP-1669 due to the Plaintiff's attorney, Lee Pearlman, **never** having filed a summary judgment rebuttal affidavit (required), but because of

the severity of the Florida Slayer Statute count violation, the case warranted the 2DCA reversing the order with prejudice and sending the case back to the trial judge for an investigation into the decedent's murder, as stated in the Plaintiff's murder count, but the 2DCA, specifically Edward LaRose, was already in on the RICO plan to cover-up the decedent's murder by way of both the chief judge's office at the 13th Judicial Circuit (Manuel Menendez) and the chief judge's office at the Florida Supreme Court, Ricky Polston.   Consequently, the 2DCA deliberately failed to notify anyone of the decedent's murder or the Florida Bar for a disciplinary action to be taken on Lee Pearlman for his negligence during the probate farce, case 12-CP-1669.   The Florida 2DCA judges played their part as accessories after the fact in the decedent's **murder cover-up** by turning a blind eye to the decedent's state and federal substantive due process rights by committing more patterned racketeering activities throughout the years (2012 – present) in covering up the prior racketeering activities committed by the three (3) local enterprises that illegally participated in this matter.   The accomplices are:   **Ricky Polston, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Manuel Menendez (Section § 1962(b)), Edward LaRose (Sections § 1962(b & c)), Patricia Kelly and Nelly Khouzam** for the above reasons.   See Appendix B documents.

**58C.** Then the Plaintiff filed a separate complaint for tortious interference with inheritance on both Sybil Murphy and Robert Welker, case 14-CA-10278. Bernard Silver presided. This resulted in Bernard Silver making a deliberately false ruling to dismiss case 14-CA-10278 based on the Plaintiff supposedly suing the beneficiaries again for where the decedent's property should have gone. **Fraud!** The basis for the dismissal was Florida Statute 733.103(2). This statute comes into effect only if one is suing parties a second time for where property has gone (collateral estoppel), not in suing a beneficiary of an estate for having committed an intentional tort. In rem is having the jurisdiction of the probate court decide where the location of a deceased person's property will go. Florida statute 733.103 only has relevance when suing again as to where (location) legally probated property should have gone, not for suing a person who has illegally interfered with someone inheriting property. Looking back at this case, By beyond reasonable doubt evidence, Bernard Silver's arbitrary, capricious and pretextual ruling on 2-6-15 did **not** have anything to do with Manuel Menendez authorizing his secretary, Kimberly Cash, to slander the Plaintiff per quod with him. And an affidavit from Kimberly Cash, stating that she slandered the Plaintiff with Bernard Silver around 1-6-15, placed in case file 17-CA-902, was a **ruse**

242

to fool the Plaintiff into believing that the courthouse having slandered him with Bernard Silver, was the reason for his having lost case 14-CA-10278. During case 14-CA-10278, Thomas Rydberg, both a CNA Insurance Company counselor for Robert Welker and a private attorney for Sybil Murphy, filed bogus documents, committing multiple mail and/or wire fraud solicitations to Bernard Silver to dismiss this case, one based on Florida Statute 733.103 which Bernard Silver illegally used, dismissing this case when all of these accomplices knew better. This is called having committed **a fraud on the court.** Before the Plaintiff was slandered per quod with Bernard Silver by Manuel Menendez's office, case 14-CA-10278, Bernard Silver violated the Plaintiff's first 1st amendment rights by having given an order on 12-18-14 for just the Plaintiff to never contact his office by telephone again, or be held in contempt of court (order is in appendices). The Plaintiff made a complaint to Manuel Menendez's office before 12-18-14 about having never received a returned telephone call in over 30 days from Bernard Silver's office and was wondering if he and his judicial assistant were still in business. All of this built up biasness by Bernard Silver, and yet he refused to recuse himself from case 14-CA-10278, remaining on it to commit prejudicial treatment of the Plaintiff, violations under Title 42, Chapter 21, U.S. Code § 1985(3) by reversely discriminating against him on 12-18-14, 1-

6-15 and 2-6-15.  Bernard Silver had an axe to grind, but was also being required by his superior, Manuel Menendez, to continue presiding on case 14-CA-10278 to monetarily damage the Plaintiff.   The accomplices are:  **Chief Judge of the Florida Supreme Court during this time with Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Kimberly Cash, Bernard Silver, Manuel Menendez (Section § 1962(b)), Sybil Murphy (Section § 1962(b)), Robert Welker, Thomas Rydberg and CNA Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant,** for the above reasons.  See Appendix C documents.

**58D.**  The Petitioner then filed suit on his former probate attorney, Lee Pearlman, in case 14-CA-12257, for negligently representing him in probate court.  The original judge on this case, William Levens, was about to retire, so he allowed himself to be recused by the Plaintiff on 4-6-16 rather than illegally violate any more of his state and federal substantive due process rights by illegally dismissing case 14-CA-12257 at the request of Chief Judge Ronald Ficarrotta.  The second judge on this case, Mark Wolfe, was removed and sent to criminal court, compliments of Ronald Ficarrotta after refusing to **fully** grant

opposing party's false motion to stop the Plaintiff from acquiring any banking records on the decedent, as seen in court order 5-18-16. **And for his unwillingness on 4-25-16 to agree to hear Thomas Rydberg's verbal request (solicitation) for a summary judgment motion to be heard , case 14-CA-12257, in order to have this case illegally dismissed when he, and whoever else he was representing, were not party to the case!** Mark Wolfe might make a good witness for law enforcement against Ronald Ficarrotta and the secondary enterprise consisting of local district judges and attorneys and should be given immunity from prosecution.

Attorney Lee Pearlman, the defendant in case 14-CA-12257, was unofficially (no notice of appearance) represented on 3-8-16 until shortly after 4-25-16 by his legal opponent, Thomas Rydberg, from the Plaintiff's probate case (12-CP-1669)! Thomas Rydberg was trying to stop the Plaintiff from obtaining banking information on the decedent, but when he failed, he stopped representing Lee Pearlman in court case 14-CA-12257. The Plaintiff then decided to depose Sheriff Chad Chronister from HCSO during this case to find out why for the past three (3) years the HCSO gang of officers had refused to investigate the decedent's murder. Jason Gordillo at HCSO filed a bogus motion to quash the sheriff's subpoena, but Richard Nielsen, the third judge on case 14-CA-12257, was not going to commit a fraud on

the court unless made to by the Chief Judge Ronald Ficarrotta. Chad Chronister was ordered by Richard Nielsen on 1-10-18 to come to court on 1-25-18 with his calendar. **And the Plaintiff back then, had Adam Wieser from ABC, Inc. (Disney) ready to film at the court hearing.** When push came to shove, Chad Chronister contact Ronald Ficarrotta to stop this hearing and Robert Nielsen illegally dismiss case 14-CA-12257 on 1-24-18, one day before the motion to quash Chad Chronister's deposition was scheduled to be heard (1-25-18), with perhaps a salary increase, or the ability to stay in his cushy civil division indefinitely as a bonafide member of the secondary enterprise in good standing. **Adam Wieser's commentary to the Plaintiff as to why the case had been illegally dismissed was based on information from an ABC, Inc. employee working at HCSO around 1/2018.** The illegal final order dismissing case 14-CA-12257 stated that the case was dismissed because **1)** the Plaintiff did not have any damages to sue Lee Pearlman for. **<u>Fraud!</u>** Consequently, the Plaintiff did not have a right to sue his extremely negligent attorney for failing to file an affidavit to refute opposing party's summary judgment affidavits, costing him the probate case. And the Plaintiff lost the probate case because **2)** he should have divested the benefits of the gift deed instrument that the Plaintiff never officially received from the caretakers, as part of their estate plans for the decedent,

before contesting the decedent's will instrument.   **Total fraud!
If the Plaintiff did not have any damages from his mother being
murdered and a voided gift deed given to him by the caretakers
as a joke, why should he of had to divest anything before
contesting the false will instrument which allowed the
caretakers to make claim to over a million dollars' worth of his
mother's property?   Hysterical!   The property given to the
Plaintiff as a gift deed was not delivered to him before the
decedent died, voiding the gift deed benefit.   Fraud!**
Consequently, the Plaintiff was not going to be given his day in
court by Richard Nielsen, HCSO and Ronald Ficarrotta to prove in
case 14-CA-12257 before a jury of his peers that **1)** the decedent
was murdered and her will instrument was worthless and **2)** the
Plaintiff would have won case 12-CP-1669, if not for the
intentional defrauding of the Plaintiff by Lee Pearlman.
Richard Nielsen knew before he signed the final order with
prejudice in case 14-CA-12257 that under Florida law, a gift
deed has to be delivered to the intended recipient by the person
gifting the property before their death.  He also knew that an
inheritance gift only needs to be divested, if the inheritance
instrument through which the gift is made is being contested and
the will instrument was being contested in case 12-CP-1669, not
the deed instrument.  Robert Nielsen knew these facts because
the Plaintiff told him during the summary judgment hearing on 1-

247

17-18 with a court reporter present and the transcript from this hearing was filed on 3-7-18 into the case file (14-CA-12257). The appeal for this case was illegally affirmed by the 2DCA on 12-5-18, case 2D18-694, a violation of the Plaintiff's state and federal substantive due process rights, once again by the secondary enterprise.  The accomplices are: **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Edward LaRose (Section § 1962(b)), Patricia Kelly, Samuel Salario, Matthew Lucas, Ronald Ficarrotta (Section § 1962(b)), Chad Chronister (Section § 1962(b)), Richard Nielsen, Mark Wolfe, Lee Pearlman, William Levens, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC and Florida's Lawyer's Mutual Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant,** for the above reasons.  See Appendix D documents.


**58E.**  At the very first hearing on 9-6-17 with Robert Nielsen presiding on case 14-CA-12257, additional objections were heard along with the Plaintiff amending his complaint with a verbal motion to dismiss the case, made by Thomas Rydberg's attorney, Michael McGirney, working for the firm of Spector Gadon & Rosen, P.C., who was being paid by Axis Insurance.  A notice of

appearance and joinder to Michael McGirney's motion was also filed by CNA Insurance Company representing Robert Welker, **all of whom were <u>not</u> party to the case, or representing anyone officially who was party to the case.** On 9-6-17, Michael McGirney stated to Richard Nielsen that the Plaintiff was a threat to all parties (enterprises), having freely filed complaints on attorneys and judges, was quite a litigator. **He then asked Richard Nielsen to take caution of this and then verbally soliciting him to illegally dismiss case 14-CA-12257.** Richard Nielsen stated that he had never had anyone ask him to dismiss a case based on the reasons presented, but by beyond reasonable doubt evidence, Richard Nielsen dismiss the case illegally when he was asked to by his boss Ronald Ficarrotta. By beyond reasonable doubt evidence, case 14-CA-12257 was illegally dismissed on 1-24-18 compliments of Chad Chronister having solicited Ronald Ficarrotta to make Richard Nielsen do so. This was not Ronald Ficarrotta and Richard Nielsen just having committed a fraud on the court, **but was racketeering!** A transcript can be ordered by the Plaintiff, if desired. The Defendants are: **CNA Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with a Section § 1962(d) violation** and **Axis Insurance for vicarious liability under the Respondeat Superior Doctrine in conjunction with a Section § 1962(d) violation,** See documents in appendix D.

**58F.**   During the beginning of 2017, the Plaintiff filed a complaint in federal court, Middle District of Florida, case 8-17-CV-219-7-36MAP, for Bernard Silver having violating the Plaintiff's state and federal substantive due process rights and liberties under the 1st, 5th and **14th amendments to the U.S. Constitution,** when he violated (**Title 42, Chapter 21, Subchapter 1, U.S. Code § 1983)** during case 14-CA-10278, but Charlene Honeywell, the federal judge on this case, illegally dismissed it on 5-9-17, violating the Plaintiff's federal substantive due process rights before he was even allowed to have federal marshals serve Bernard Silver (defendant) with the complaint! In *Hishon v. King & Spalding*, 467 U.S. 69 (1984), the petitioner's complaint states a claim cognizable under Title VII, and she was therefore **entitled to her day in court to prove her allegations.** Pp. 73-79. Charlene Honeywell wrongly stated in her order that the Plaintiff had no right to sue Bernard Silver under Title 42, Chapter 21, U.S. Code § 1983 because he had judicial immunity from having erred. **Fraud!** **This case was not to be decided by the presiding judge before discovery had even started, but by a jury under amend. VII to the U.S. Constitution, as stated in the Plaintiff's complaint!** Accomplice Bernard Silver used a phony reason, probate statute 733.103, to carry out an improper motive against the Plaintiff